**Dorotea Zaldivar V. DE TENORIO, Plaintiff-Appellee,**

v.

**H. E. McGOWAN et al., Defendants-Appellants.**

**No. 74–1082.**

United States Court of Appeals, Fifth Circuit.

March 19, 1975.

Rehearing and Rehearing En Banc Denied May 28, 1975.

See 513 F.2d 294.

Tally D. Riddell, Quitman, Miss., for McGowan et al.

Jack H. Ewing, Jackson, Miss., for Love Pet. Co., et al.

Herbert R. Ginsberg, Hattiesburg, Miss., for J. L. Sellers and W. Fairchild.

Paul M. Neville, Meridian, Miss., for Smith and Corsair Pet.

Thomas H. Watkins, Jackson, Miss., for Cecil Barnett.

Vardaman S. Dunn, Jackson, Miss., David A. Kattan, New Orleans, La., for plaintiff-appellee.

Before COLEMAN, GODBOLD and RONEY, Circuit Judges.

COLEMAN, Circuit Judge.

This is an appeal by Hamilton E. McGowan, the defendant below, and a brother of Elbert J. McGowan, deceased, from a judgment vesting an undivided one-half interest in thirty-seven acres of land in Clarke County, Mississippi, in Dorotea Zaldivar V. De Tenorio, a non-resident alien, De Tenorio v. McGowan, 364 F.Supp. 1051 (S.D.Miss., 1973). Appellee De Tenorio claims the land by inheritance from her deceased sister, who, in turn, allegedly inherited the land from her deceased husband, Elbert J. McGowan. Both appellee and her deceased sister had been and were resident citizens of the Republic of Honduras.

Appellant argues that the widow lost her interest in the land by failing to comply with the requirements of a 1928 Treaty between the United States and the Republic of Honduras. He asks that title be confirmed in the defendants-cross-complainants.

We reverse and remand.

## FACTS

In 1911, by deed of conveyance, Elbert J. McGowan became the owner of twenty-seven acres of land in Clarke County, Mississippi. In 1915 he acquired, by deed, ten additional acres. These parcels constitute the thirty-seven acres here in question.

Both deeds were properly recorded in the land deed records of Clarke County, Mississippi, on December 20, 1915. The District Court found that these conveyances vested E. J. McGowan with the fee simple *record* title to this land.

Between 1911 and 1914 E. J. McGowan left Mississippi and returned only twice, the last time in 1936. This was the last contact any member of the family is known to have had with him during his lifetime.

After leaving Mississippi, E. J. McGowan returned to Central America, where, in 1940, he married Maria Obdulia Zaldivar, of Honduran nationality. Although there originally were claims to the contrary, abandoned during the course of this litigation, no children were born of this union. E. J. McGowan remained a United States citizen, but died intestate on October 31, 1957, in the Republic of Panama.

Hamilton E. McGowan, of Vossburg, Mississippi, was a brother of Elbert J.

McGowan. Elbert's United States passport designated Hamilton McGowan as the person to be notified in case of his death. In 1957, Hamilton was so notified by the United States Consul in Panama. This notification revealed that Elbert's effects had been placed in the hands of his widow, and listed other known relatives as two brothers, Hamilton E. McGowan, of Vossburg, and M. M. McGowan, of Jackson, Mississippi. After Elbert's death, no member of the family communicated with his widow or undertook to advise her concerning any land E. J. McGowan owned in the State of Mississippi. Neither did she, or her counsel, communicate with the McGowans. Silence reigned supreme on both sides.

In 1958, after the death of her husband, Maria Obdulia Zaldivar McGowan left Panama, went back to Honduras, and lived there with her sister, the plaintiff-appellee here, until her death. While thus residing in the Republic of Honduras, Maria died intestate on February 28, 1969, without being remarried or having any children. At no time did she ever renounce her Honduran citizenship. She was survived by one sister, appellee De Tenorio, and one brother, Felipe. Maria's other brothers and sisters were of the half blood, and neither of her parents survived her death.

It is undisputed that the taxes on the lands in question were never paid by Elbert J. McGowan, but were always paid by his brother, Hamilton E. McGowan. In addition to paying the taxes, Hamilton E. McGowan used the land, retained the profits, and acknowledged his brother's ownership of the land in a number of ways, such as failing to have the tax assessment changed to him as owner and by subscribing as a witness to an oil and gas lease purportedly executed by E. J. McGowan in 1939.

In 1968, Hamilton E. McGowan filed suit in the Chancery Court of Clarke County, Mississippi, asserting title in himself by adverse possession and seeking confirmation of his alleged title to the land. Elbert's widow, Maria Obdulia Zaldivar McGowan, was living at the time in the Republic of Honduras, but she was not named as a party to the suit, nor was she served with notice or process. A decree was entered on the complaint by default. This decree was asserted by the defendants-appellants in the District Court as *res judicata*. The Court held that this decree was ineffective against Maria, Elbert McGowan's widow and appellee's sister, for lack of due process of law guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States, and applicable under the terms of the Treaty between the United States and Honduras. This holding is not challenged on appeal. The District Court further held that Maria Obdulia Zaldivar McGowan's interest in the land formerly owned by her husband, Elbert, could not be divested from her in the absence of *due process of law* and *without just compensation*. It concluded by a "liberal interpretation" of the Treaty that Maria's heir, Dorotea, was entitled to the same protection.

## THE LAW

The applicable Mississippi statute, Section 842 of the Code of 1942 [now Section 89–1–23 of the Code of 1972, which goes back to Section 2439 of the Mississippi Code of 1892] provides:

> "Resident aliens may acquire and hold land, and may dispose of it and transmit it by descent, as citizens of the state may;
>
> but non-resident aliens shall not hereafter acquire or hold land * * *."

▪ This statutory provision yields, of course, to any applicable provision of any valid Treaty of the United States with a foreign country, constituting a part of the Supreme Law of the Land, United States Constitution, Article 6, Clause 2, Hauenstein v. Lynham, 100 U.S. 483, 25 L.Ed. 628 (1879); Clark v. Allen, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947).

The pertinent portions of the 1928 Treaty with Honduras read as follows:

*"[From] Article I*

"The nationals of each High Contracting Party shall enjoy freedom of access to the courts of justice of the other on conforming to the local laws, as well for the prosecution as for the defense of their rights, and in all degrees of jurisdiction established by law.

"The nationals of each High Contracting Party shall receive within the territories of the other, upon submitting to conditions imposed upon its nationals, the most constant protection and security for their persons and property, and shall enjoy in this respect that degree of protection that is required by international law. Their property shall not be taken without due process of law and without payment of just compensation.

. . . . .

*"Article IV*

"Where, on the death of any person holding real or other immovable property or interests therein within the territories of one High Contracting Party, and such property or interests therein would, by the laws of the country or by a testamentary disposition, descend or pass to a national of the other High Contracting Party, whether resident or non-resident, were he not disqualified by the laws of the country where such property or interests therein is or are situated, such national shall be allowed a term of three years in which to sell the same, this term to be reasonably prolonged if circumstances render it necessary . . . .."

By the express provisions of the Treaty, McGowan's widow had until October 31, 1960, in which to sell the thirty-seven acres of land in Clarke County. The term for the exercise of that right might "be reasonably prolonged if circumstances *render it necessary.*" (emphasis ours).

Prior to the cut off date, Mrs. McGowan took no action to sell the property, nor did she do so during the ensuing nine years. Indeed, although the record shows that Mrs. McGowan, the widow, was represented by counsel in closing her husband's affairs she died without making any inquiry or taking any action to sell the land.

The case, then, is reduced to whether under the Treaty the sister was entitled to a "reasonable prolongation" of the sale period, *rendered necessary by the circumstances.*

The District Court resolved the issue in the following manner, 364 F.Supp. at 1062:

"It is clear under the treaty involved herein that Maria Obdulia Zaldivar McGowan had the right to acquire realty in Mississippi by inheritance, notwithstanding the common law and statute of Mississippi to the contrary. It is not so clear that her next of kin were entitled to acquire this same inheritance when she died intestate. As to this point, in the absence of specific language in the treaty providing for this eventuality, the Court is inclined to construe the treaty liberally and hold that such heirs are entitled to the same protection under the treaty as their deceased kinswoman would have had. Nor does this Court have much judicial precedent to aid in determining under what circumstances the three year period for selling the property should be reasonably prolonged. The Court has, however, carefully weighed all of the circumstances and finds that the interest of E. J. McGowan's widow *could not be divested from her in the absence of due process of law and without just compensation, both of which are guaranteed by the treaty. Otherwise is to declare a forfeiture which is not favored in law.* (emphasis added). Maria Obdulia Zaldivar McGowan had no knowledge of the provisions of the treaty or any knowledge of her inheritance or the attempted divestiture. Similarly, her heirs, plaintiff and Felipe Murillo Zaldivar, had no knowledge. *Until they were made aware of their interest, the circumstances were such as to require*

*a prolongation of the three year period in which to divest themselves of their inherited interests.* (emphasis added). The brother, Felipe Murillo Zaldivar, has within a necessarily prolonged term divested himself in favor of the minor wards of Peter K. Smith, at one time in this action alleged to be the grandsons of E. J. McGowan. The named plaintiff, Dorotea Zaldivar V. De Tenorio, filed this suit within a reasonable time of her knowledge.

"The Court therefore finds that the named plaintiff, a resident citizen of Puerto Cortes, Honduras, is entitled to a one-half undivided interest in and to the 37 acre tract of land * * *."

We construe the decision to stand for the proposition that the three year limitation of the Treaty is inoperative unless someone, somewhere, someway, gave Mrs. McGowan actual notice of her ownership and warned her of the Treaty limitation. At least, such was required to obviate the element of "a reasonable prolongation" if "circumstances render it necessary". The Treaty, of course, contains no such command. The additional elements of the decision are that she could not be deprived of her property without "due process of law" and "reasonable compensation". The decision does not hold that Hamilton McGowan's status as a "fiduciary" required him to give actual notice to the widow of his deceased brother. The laws of Mississippi flatly provided that the Widow McGowan could not inherit the land. The record is totally devoid of the slightest suggestion that Hamilton McGowan had ever heard of the Honduran Treaty of 1928.

Upon briefs and oral argument, our reaction to questions concerning "construction of the Treaty" is that matters of construction arise only when the language of a document is reasonably susceptible to more than one interpretation. The District Court, and the parties, have frequently alluded to paucity of precedent involving the Treaty language involved in this litigation. A reasonable explanation for this is that the language is quite plain and clear, obviating the necessity for frequent or extensive interpretation by the Courts.

▇ The language in the last sentence of the fourth paragraph of Article I, reads, "Their property shall not be taken without due process of law and without payment of just compensation". This obviously refers to one of the contracting powers taking property from the citizen of the other. This is so because private parties, personal or corporate, have never had the right to take property from another. Consequently, this limitation must be construed as referring to takings by the respective signators to the Treaty from citizens of the other. The litigation now before us does not involve expropriation, eminent domain, or any similar taking of property by governmental action. Accordingly, we are unable to see how the due process feature enters this case except for Hamilton's futile suit to acquire title, in which he obviously failed to give the notice required by Mississippi law. That failure may be explained by his ignorance, and that of his counsel, of the Honduran Treaty. Under state law, Mrs. McGowan in Honduras was clearly not a party in interest.

▇ The Treaty nowhere hints or suggests that the Courts of the respective sovereigns are to be deprived of jurisdiction to adjudicate property rights within their respective territories. An appropriate judicial determination of title takes no property; it simply adjudicates where the title legally rests. This case deals with whether, in fact and in law, the widow of the deceased McGowan, or her heirs, have any property interest in the thirty-seven acres of land. Obviously, if within the terms of the Treaty they had any property rights it was the duty of the District Court to so hold. If there were none, a similar duty existed. As to that, all the parties here had their full day in Court and there was no denial of due process. The due process argument, therefore, is irrelevant.

This remands us to the decisive factor in the case, the application of the perti-

nent provisions of Article IV, which, stripped of inapplicable language, might appropriately be defined as follows:

"Where, on the death of any person holding real or other immovable property or interests therein within the territories of one High Contracting Party, * * * such national shall be allowed a term of three years in which to sell the same, this term to be reasonably prolonged if circumstances render it necessary . . .."

■ We construe "circumstances rendering the action necessary" to mean circumstances existing during the three year period, such as an inability to satisfactorily clear title, an inability to sell for fair market value, wilful frustration of the effort to sell, and like events.

We have already pointed out that from October 31, 1957 until February 28, 1969—eleven years and four months—Mrs. McGowan made no effort to take any action whatever, by sale or otherwise, with reference to the property inherited, with limitations, from her deceased husband.

On what theory is it to be held, then, that this long term of inaction, almost four times the primary term prescribed by the Treaty, may at this late date be judicially prolonged as "a matter rendered necessary by the circumstances?"

The only reason advanced is that the Widow McGowan did not know of the property owned by her husband, did not know the rights conferred upon her by the Treaty, and Hamilton McGowan failed to inform her of it, although, as already stated, there is no proof that he,

a layman residing in Mississippi, had any knowledge of the Treaty.

It seems likely that Mrs. McGowan did not know of the land, but the only proof to support this conclusion is the testimony of her sister, the present claimant to the property, who said that Mrs. McGowan never mentioned the existence of Mississippi or any property in it.[1]

Balanced against this is the fact that when her husband died in Panama, there was an intestate succession [administration] in that jurisdiction, in which the widow received all of her deceased husband's property in that jurisdiction, *and was represented by counsel.* Living with her husband, an American, for eighteen years she is bound to have known that her husband had a United States passport, especially since the record indicates that she had one also. In any event, the Consular report of his death named her as his heir and named the two brothers and their addresses in Vossburg and Jackson, Mississippi, as surviving relatives. If the United States Consul obtained this information from some source other than the widow, who was the only person in Panama who could have told him of it, she at least was put on notice of it when she received as she did, a copy of the Consular report.

Conceding, however, that the widow knew nothing of the land owned by her husband the record leaves no room for doubt that she knew he had brothers in Mississippi and, if she was interested in the subject, that he might have land there.

■ This inexorably brings us to the uniformly followed principle of Mississip-

---

1. "Q. [by claimant's counsel]:

 While the two of you were living together after Mr. McGowan's death, under the same roof, did Obdulia ever mention to you anything about the United States or any property in the United States?

 "A. No.

 "Q. Did she ever discuss with you or mention to you anything about the State of Mississippi?

 "A. No.

 "Q. Did Obdulia speak any English at all?

 "A. No, very little.

 "Q. When you heard Obdulia talking with Mr. McGowan in what language were they speaking?

 "A. In Spanish. But he didn't pronounce the language very well.

 "Q. Did you ever overhear any conversation or talk between Obdulia and Mr. McGowan about any properties in the United States?

 "A. No."

pi real property law that once a deed of conveyance is lodged with the proper officer *for public* record in the county where the land is located it is, from that moment, constructive notice to the world, Aultman v. Kelly, 236 Miss. 1, 109 So.2d 344 (1959); Frierson Building Supply v. Pritchard, 253 Miss. 541, 176 So.2d 301 (1965). The public land records are open to anyone who wishes to look. All her counsel had to do was make inquiry.

■ Represented by counsel, as she was, in an estate which was formally administered in Panama, we must hold that Mrs. McGowan's failure over a period of nearly twelve years to have the records examined, or to make any inquiry whatever, although assisted by counsel, totally negates the existence of *circumstances necessitating* a prolongation of the three year period in which she had the clear right to sell this land and receive the proceeds.

To hold otherwise would be to say that the Treaty Makers intended that property rights within their respective jurisdiction may be left in limbo for so long as alien owners choose not to make inquiry as to the possible existence of title, open and available to the world. This could not further, but would damage, the property rights of the citizens of either jurisdiction, something they both had a duty to protect and no doubt intended to protect.

We are not altogether without precedent in the cases dealing with Treaty rights such as we now have before us.

A case similar to the one at bar is Miller v. Clausen, 8 Cir., 1924, 299 F. 723, appeal dismissed 269 U.S. 595, 46 S.Ct. 105, 70 L.Ed. 431 (1925). In *Miller*, one Andrew Hansen died in 1911 in the United States owning property here, leaving as his sole heir at law his father, Hans Christian Hansen, who was a resident and citizen of Germany. The United States had a Treaty with Germany similar to the one here involved, but with nothing comparable to Article I in the Honduran Treaty. Hans Christian Hansen, still in Germany, died in 1916. He left as his heirs brothers, sisters, nephews, and nieces. Only one of these heirs was a resident of the United States, i.e., Catharina Clausen. Thus, five years after he acquired an interest in the land from Andrew Hansen, Hans died without having made any conveyance thereof.

In 1919 the Alien Property Custodian seized the property. Catharina Clausen then filed a petition in the County Court in Nebraska to have herself declared the sole heir at law of Andrew Hansen and the Court so decreed. She then brought an action in the United States District Court against the Alien Property Custodian and the Treasurer of the United States to require delivery to her of the property. The other heirs of Hans Christian Hansen took the position that they acquired title as heirs of Hans Christian Hansen. The Eighth Circuit held, however, that the only person who could acquire property through Andrew Hansen was Catharina Clausen, who acquired same as a direct heir of Andrew Hansen *and as the only one who was a resident* of the United States. The Court in so holding used the following language:

"Therefore, on the death of Andrew Hansen, something less than a fee simple absolute, a base or qualified fee or a terminable fee vested in Hans Christian Hansen, and the remainder vested in Catharina Clausen, and after a reasonable time had elapsed without Hans Christian Hansen having availed himself of the rights given him by the treaty, there was a failure of the conditions imposed by the treaty, the title of Hans Christian Hansen failed by operation of law, the statute came into full force and effect, and the full fee-simple title vested in Catharina Clausen." 299 F., at 727.

Appellee De Tenorio distinguishes this holding by pointing out that the Treaty involved in *Miller* did not have a clause which prohibited the taking of property without due process of law and without payment of just compensation, as does Article I of the Treaty with Honduras.

We have already disposed of this argument., *supra*.

 It is urged that under the facts of this case Hamilton McGowan was "fiduciary" to the widow of his deceased brother. For reasons quickly to be stated we hold that Hamilton was not a fiduciary to his former sister-in-law.

Prior to October 31, 1957, the date of Elbert's death, such a relationship could not have arisen because Elbert was the sole owner of the Clarke County property, acting in his own right. Before Hamilton McGowan so much as knew of the existence of a sister-in-law (which was learned from the Consul's death report), the relationship had been dissolved when Elbert died childless, Wilbe Lumber Company v. Calhoun, 163 Miss. 80, 140 So. 680 (1932). Mrs. McGowan was an adult, not a lunatic, and personally a total stranger to her former brother-in-law. Neither before nor after October 31, 1957, did Hamilton McGowan see Mrs. Elbert McGowan or have the first word of communication with her, directly or indirectly, written or oral. In this set of circumstances a fiduciary relationship was totally nonexistent.

Neither did such a relationship arise from the conflicting interests of Hamilton and Mrs. Elbert McGowan in the title to the land. When Elbert drew his last breath on October 31, 1957, the widow was vested with title to the land which her husband had formerly owned, *with sole power of disposition*, subject to defeasance only in the event of her own failure to comply with the terms of the Honduran Treaty. On the other hand, Hamilton's interest in the land was a vested remainder, which Mrs. McGowan could defeat at pleasure by complying with the Treaty. See Mississippi College v. May, 235 Miss. 200, 108 So.2d 703 (1959).

 Consequently, Hamilton McGowan was neither a tenant in common nor a joint tenant with his former sister-in-law. His interest conflicted with hers to the extent that he could only hope for title in fee if she failed to exercise her right of disposition in compliance with the Treaty. The fiduciary principles usually applicable to such tenancies in common simply did not apply here. In the total absence of an agreement to the contrary, the hostility of Hamilton's interest to that of his sister-in-law was the antithesis of a fiduciary relationship. No law could require him to aid a total stranger to defeat his own title.[2]

 Neither does the fiduciary argument attribute proper significance to the indisputable fact that under Mississippi law real property could not be inherited by a Central American alien. If Hamilton McGowan acted in reliance on the Mississippi statute prohibiting inheritance of real property by aliens, and if he did not know of the Honduran Treaty, then he was guilty of no intentional dereliction for, in the absence of the Treaty, no duty could have existed. The record in this case is totally bare of any evidence of treaty knowledge on the part of Hamilton.

The legal brook in this litigation ultimately runs down to the proposition which the District Court seems to have adopted, that is, with no more communication or contact than he had with his former sister-in-law, the failure of Hamilton McGowan to give her actual notice of the existence of the land and of her Honduran Treaty rights establishes, within the terms of the Treaty, the required "necessity" for the prolongation of the specific three year term in which Mrs. McGowan could have freely sold the land. Indeed, the effect of the District Court judgment is that this "necessity" would continue until someone, somewhere, someway, should give actual notice to an alien inheritor of land, or to

---

**2.** We cannot agree that Hamilton McGowan's long and continued use of the land with his brother's permission created a trust, the obligations of which would pass to the permissive brother's widow. Under Mississippi law, McGowan was undoubtedly a mere tenant at will or sufferance. See St. Regis Pulp and Paper Corporation v. Floyd, 238 So.2d 740, 743 (1970), and the Mississippi cases there cited.

those who inherit from the original inheritor, and so on down the line.

Such a construction of the Treaty, where there are aliens in the chain of title would make a shambles of land titles. That is exactly what happened here. There was no effort to enforce the Treaty rights until an oil well had been brought in, whereupon the Treaty was dusted off in an effort to scramble the title, an eventuality which surely must have been beyond the anticipation of those who drafted, signed, and ratified the Treaty in an effort, for a reasonable time, to confer upon aliens a right which by state law was categorically denied.

Accordingly, we hold that the primary term in which Mrs. McGowan could have exercised the Treaty right of disposal expired on October 31, 1960; that during that time frame, and for the remaining eight years of her life, no existing necessity was claimed by her for the prolongation of the three year period. Neither have the subsequent heirs established any such necessity. The total inaction reflected by this record cannot, by some kind of judicial wand waving, be converted into "a necessity".

We need not reach or decide what rights Mrs. McGowan's heirs might have had if she had died during the three year period prescribed by the Treaty. She lived on until 1969, taking no action, under the Treaty or otherwise.

There are sundry other arguments which have not gone unnoticed.

Appellee turns the spotlight on Section 842 of the Mississippi Code of 1942, which allows non-resident alien citizens of Syria or the Lebanese Republic to inherit property from citizens or residents of Mississippi, but denies that right to all other non-resident aliens. Hence, she argues that the statute "denies to these selected aliens the equal protection of the law, contrary to the Fourteenth Amendment [and] constitutes an unconstitutional intrusion by the state into the field of foreign affairs which is entrusted to the President and Congress".

Resident aliens, lawfully in the United States, are undoubtedly entitled to the equal protection of the law, Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). It is equally obvious that the Fourteenth Amendment, by its own terms, has no application to aliens not within the jurisdiction of the United States.

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Mississippi statute was not attacked in the District Court and there was no request that a three judge court be convened. In any event, when the statute was last amended, Chapter 237, Laws of Mississippi of 1940, it contained the usual severability clause [Section 4]. Additionally, if the statute, as presently written, were to be invalidated, necessitating a return to the previously existing valid statute[3] the legal status of the plaintiff-appellee as a non-resident alien would remain the same. To go a step further, if all the statutes were to be set aside, the status of the non-resident alien under the common law would prohibit her owning title to land in Mississippi, Scottish American Mortgage Company v. Butler, 99 Miss. 56, 54 So. 666 (1911).

Appellee suggests that if she cannot acquire title to the land (for sale under the Treaty) then the property must necessarily escheat to the State. The Mississippi claimants to this property are parties to this litigation. We,

---

3. Lawrence v. Mississippi State Tax Commission, 162 Miss. 338, 137 So. 503; affirmed, 286 U.S. 276, 52 S.Ct. 556, 76 L.Ed. 1102, 87 A.L.R. 374.

therefore, point out that although § 89–1–23 Mississippi Code Ann., 1972, provides for all land acquired contrary to that section to escheat to the State, it must be read in conjunction with § 89–11–1 Mississippi Code Ann., 1972, which escheats property to the State when a person dies intestate *leaving no heir capable of inheriting the property* (emphasis added). Under Mississippi law the non-alien heirs had a vested remainder in the land, see Mississippi College v. May, *supra.*

In accord is 3 Am.Jur.2d, Aliens & Citizens, § 27, page 874:

"It is a principle of the common law that while an alien cannot inherit, neither can he interrupt the descent of others, and therefore, if some of the persons answering the description of heirs are incapable of taking by reason of alienage, they are disregarded and the whole title vests in those heirs competent to take provided they are not compelled to trace their inheritance through an alien."

And, also, 27 Am.Jur.2d Escheat, § 12, page 880:

"Incapacity of the heirs first entitled to succeed to property will not effect an escheat, but the property will pass to the persons next entitled to take as though the first heirs had not existed."

Appellee places great weight on Guiseppe v. Cozzani, 238 Miss. 273, 118 So.2d 189 (1960); 248 Miss. 588, 159 So.2d 278 (1964); and 193 So.2d 549 (1966). This case, which made three appearances in the Mississippi Supreme Court, is distinguishable from the case at bar. *Guiseppe* involved tenants in common, some of whom were aliens living in Italy. Under the terms of a will left by a deceased in 1906, their rights accrued subject to a life estate which ended in 1933. In the first appeal, the Mississippi Supreme Court held that the complaint filed by the alien heirs was sufficient to state a cause of action and that the Chancery Court erred when it sustained the defendant's demurrer. At the second trial, no evidence was taken and the Supreme Court held on appeal that the lower court had abused its discretion when it refused to grant a continuance and dismissed the complaint with prejudice. On the third and final appeal, the Mississippi Supreme Court held that when the heirs in America filed an affidavit in Chancery Court that there were no living heirs in Italy, *knowing this to be false,* they perpetrated a concealed fraud on the Chancery Court and the alien relatives, and that the alien relatives were not barred by the adverse possession statute, § 15–1–9, Mississippi Code Ann., 1972, from maintaining the suit in equity. The case turned on fraud, not on an extension of time under a Treaty.

Under Mississippi law, when a person dies intestate and leaves no wife, children, or children of deceased children, any land owned in the State descends to his brothers, sisters, and parents in equal shares, § 91–1–3, Mississippi Code Ann., 1972.

Appellee has extensively briefed this case as if it were one involving a forfeiture of property and the District Court alludes to forfeitures. We see it, however, as one to adjudicate title to property. In all such cases the true status of the title is decided. One found to be without title is not the victim of a forfeiture. He had nothing to forfeit.

The judgment of the District Court is reversed and the cause remanded to the District Court for further proceedings not inconsistent herewith.

Reversed and remanded.

GODBOLD, Circuit Judge (dissenting).

The central point of this case is the fact that Hamilton McGowan was a fiduciary for his brother and for his brother's widow. His status as fiduciary requires a conclusion that the interest of the widow is protected against his claim of title.

The terms of the treaty provide that the three-year period in which the widow must sell her interest is "reasonably prolonged if circumstances render it neces-

sary."[1] In the circumstances of this case, where a fiduciary failed to inform his alien beneficiary of her interest in the property which was the subject of his fiduciary relationship, asserted title to the property in himself, and attempted to divest the widow of her interest by a state court proceeding without notice to her, it is necessary that the three-year period be "reasonably prolonged." A declaration that Hamilton holds the legal title subject to a constructive trust in favor of the widow, and that she must dispose of her equitable interest within a future time equal to that provided by the treaty, will fairly vindicate all interests in this case.

To permit Hamilton to neglect and abuse a familial-based fiduciary relationship as was done in this case and by doing so acquire title to the property which as fiduciary he was obligated to protect was too strong for the nostrils of an able and experienced trial judge. It is too strong for mine as well.

### 1. Hamilton is a fiduciary.

The District Court characterized Hamilton as a fiduciary. This factual conclusion of the trial court, necessarily determined on a case by case basis, is not plainly erroneous.

The law of fiduciary relationships is a creature of equity and gives effect to obligations of good conscience and fair dealings between persons who are in such relationship to each other that trust and confidence have been reposed by one to another, or both to each other. The underlying relationship may be what the Mississippi Supreme Court has called "conventional" in form, Ham v. Ham, 146 Miss. 161, 110 So. 583 at 584 (1926), that is, arising from familiar and defined legal relationships. These include trustee and beneficiary, agent and principal,

guardian and ward, partners and joint venturers, life tenant and remainderman, executor or administrator and heirs, tenant and cotenant. Restatement of Trusts 2d[2] § 2(b); 2 Scott on Trusts (3d ed.)[3] § 170–21 at 1366 n. 2; 5 Scott § 495 at 3534. But, necessarily, the equitable concept of the fiduciary is not quickened by only those relationships formalized into precise "conventional" legal structures. "The relation and duties involved in it [a fiduciary relation] need not be legal, it [a fiduciary relation] may be moral, social, domestic, or merely personal." Ham v. Ham, *supra* at 584 (quoting 2 Pomeroy Equity Jurisprudence (4th ed.) § 956).[4]

Mississippi gives very broad scope to the equitable doctrine of the fiduciary and of constructive and resulting trusts that are means of enforcing the fiduciary's duties.

> [T]he relation [of fiduciary] is not restricted to such confined relations as trustee and beneficiary, partners, principal and agent, guardian and ward, managing directors and corporation, etc. Davis v. Hamlin, 108 Ill. 39, 48 Am.Rep. 541; Cushing v. Danforth, 76 Me. 114; 32 Am.Jur. 835, Sec. 991; Probst v. Hughes, 143 Okl. 11, 286 P. 875, 878, 69 A.L.R. 929. It applies to all persons who occupy a position out of which the duty of good faith ought inequity and good conscience to arise. "It is the nature of the relation which is to be regarded, and not the designation of the one filling the relation." Davis v. Hamlin, supra. In the Probst case, supra, the Court said: " * * * a trusteeship may arise by virtue of any relationship of the parties in which it may be said that the one occupying the position of trustee is in duty bound to act in the utmost good faith for the benefit of the other."

\* \* \* \* \* \*

---

1. The District Court held that the heirs of the widow are entitled to the same protection as she would have had. No party questions this conclusion. For convenience I refer to the interests of widow and heirs as though the widow were still living.

2. Hereinafter "Restatement."

3. Hereinafter "Scott."

4. In *Ham* the persons involved were partners, but the court chose not to rely upon that "conventional" foundation but rather to look to their closer and more intimate relations.

"Wherever one person is placed in such a relation to another by the act or consent of that other, or by the act of a third person, or of the law, that he becomes interested for him, or interested with him, in any subject of property or business, he is in such a fiduciary relation with him that he is prohibited from acquiring rights in that subject antagonistic to the person with whose interests he has become associated."

Risk v. Risher, 197 Miss. 155, 19 So.2d 484 at 486–87 (1944) (sublessee negotiating new lease from lessor, held to be in a fiduciary relationship to the lessee-sublessor and to hold new lease as trustee for lessee-sublessor).

In Sojourner v. Sojourner, 247 Miss. 342, 153 So.2d 803 (1963), the complaint alleged that by informal and unwritten family agreement heirs to family property conveyed their interests to a brother on his promise to transfer it to his sister by deed or will after a fixed period of years. Upon his death after 11 years the sister claimed title as against the brother's widow, alleging that the widow had knowledge of the family arrangement. The complaint was held sufficient on fiduciary-constructive trust grounds. The court negatived the necessity for an "express" relationship and said:

[A] constructive trust for fraud or wrong, being based on the equitable principle that no one can take advantage of his own wrong, exists in almost any case where there is a wrongful acquisition or detention of property to which another is entitled.

Id. at 808. See also: Adcock v. Merchants & Manufacturers Bank, 207 Miss. 448, 42 So.2d 427 (1949). Bank employee, managing, controlling and collecting rents on bank's land, title placed in his name for convenience, held a fiduciary and constructive trustee for bank; unnecessary to show fraud.

I turn to examination of the relationship between Hamilton and Elbert

McGowan, recognizing that it need not, and possibly does not, fit precisely into the four corners of a "conventional" pigeonhole of the law. The beginning point is, of course, that the two were blood brothers. Elbert was absent in a foreign country, seldom returning home,[5] in no position to protect his interest in 37 acres of Mississippi land. Hamilton managed and farmed his own and other family land adjacent or nearby, so it was natural that he be called upon to care for Elbert's two small tracts. The terms of the arrangement agreed upon with Elbert's land as subject matter are not in dispute. The District Court relied upon Hamilton's own description, made in his sworn complaint in the state title confirmation suit that he filed in 1968:

Your Complainant would show that since the purchase of the land by the said E. J. McGowan from his uncle, T. J. Evans, in 1911 that he, your Complainant, has had the exclusive control, use, occupation and management of the said land. That he farmed it each and every year, and never at any time attorned to his brother or paid him anything for the use thereof; neither was the same expected or required of him.

Complainant further says that he paid all ad valorem taxes upon the land and has paid the same since his brother purchased the land in 1911 when he was away from home working on the Panama Canal, as aforesaid. Thus, for fifty-seven years between 1911 and this date Complainant has paid all the taxes and had exclusive use of the same, farming, tilling or renting the same out for the purpose of farming and tilling at all times. However, Complainant admits that he was, between 1911 and 1936, performing all of these duties without claiming title to the land as a favor to his brother and for the use of the said lands.

For more than half a century Hamilton enjoyed the permissive use of the land,

5. Twice between 1911 and his death. In his passport Elbert showed Hamilton as the person to be notified in the event of his death.

managing and farming it along with his own and other family land as a unit through tenants. He retained the profits, paid the taxes and, as Judge Coleman points out, acknowledged his brother's ownership of the land in a number of ways.

In Wofford v. Wofford, 244 Miss. 442, 142 So.2d 188 (1962), a son managed the real estate of his mother, exercising control over it, repairing buildings on it, and paying taxes on it. Subsequently he claimed to be owner of the property by virtue of a quitclaim deed from his mother and a tax deed pursuant to a sale for unpaid taxes. Though finding no actual fraud, the Mississippi Supreme Court held that he was a fiduciary for his mother. The court noted the holding in Ham v. Ham, *supra*, that had pointed out the existence of fiduciary relations other than those cast in "conventional" terms. It then held that the quitclaim deed was prima facie voidable and that the son had been unable to sustain his contention that it represented a gift. The tax deed was held to give no rights to the son:

> G. W. Wofford was managing the lands at that time for his mother. His relation to his mother at that time was that of a fiduciary; and it is well-settled that a business agent or other fiduciary charged with the management of his principal's property cannot purchase and retain a tax title to the property for his own benefit. Pomeroy's Equity Jurisprudence, Vol. 3, Fifth Edition, p. 825, Sec. 959c, and cases cited.

142 So.2d at 197.

In Minor v. McDowell, 113 So. 576 (Miss.1927), a son managing his mother's plantation was held to be in an agent-principal relationship with her. In a second appeal of the same case, the Mississippi Supreme Court held:

> The relation between these parties as heretofore declared by the court was that of principal and agent. A cardinal requirement of that relationship is that the agent shall be at all times loyal and faithful to the interests of the principal, and he can acquire no private interest of his own in opposition to that of his principal. There is a fiduciary relation which forbids the agent in any manner to place himself of his own volition in a favored position as against the principal in respect to the transactions growing out of the relationship.

McDowell et al. v. Minor, 158 Miss. 788, 131 So. 278 at 280 (1930), Another principal-agent case is Van Zandt v. Van Zandt, 227 Miss. 528, 86 So.2d 466 (1956), discussed *infra*. *See also* Restatement of Agency § 389.

In Guiseppe v. Cozzani, 238 Miss. 273, 118 So.2d 189 (1960); 248 Miss. 588, 159 So.2d 278 (1964); and 193 So.2d 549 (Miss.1969), decedent died in 1896 leaving a life estate to his widow with remainder over to his nieces, nephews and a sister. The widow died in 1933. A niece residing in Mississippi conspired with her (the niece's) son to make herself sole owner to the exclusion of the other heirs, who were residents of Italy. The son petitioned to be appointed administrator of the estate, and in that petition and his subsequent petition to close that estate, made false representations the effect of which was that his mother was the sole person entitled to the property. He represented that his mother and decedent's sister named in the will were the only persons entitled to share in the estate, and that the sister had died and after diligent search and inquiry he had ascertained that she had no living descendants. In fact he had made no search or inquiry. He represented that no other persons had any interest in the estate and that his mother was sole owner. He made no mention of the nieces and nephews in Italy. In 1958 ten Italian nieces and nephews filed suit, 25 years after they became entitled to interests in the property. The Mississippi Supreme Court, reversing the trial court, considered two related issues: whether the interest of the Italian heirs as cotenants had been cut off through adverse possession by the cotenant Mississippi niece, and whether the Italian heirs were barred from relief by the limitations pe-

riod of § 710 of the Mississippi Code of 1942 [now § 15–1–9, Miss.Code Ann. 1972], which is extended by "concealed fraud." See 193 So.2d at 552–53, 554.

With respect to the first of these issues, the court held that the Mississippi niece was a tenant in common with the Italian nieces and nephews, and therefore in a fiduciary relationship with them which prevented her from holding by adverse possession without an "ouster" through actual knowledge to them of her adverse claim or through conduct so unequivocal that knowledge by those out of possession must be necessarily presumed. *Id.* at 553–54. As to the second issue, the court held there was concealed fraud, with the result that "these complainants are not barred from maintaining this suit in equity by virtue of the provisions of the Mississippi Code of 1942 Annotated, Section 710." *Id.* at 554. Thus the holding on the concealed fraud issue went to the timeliness of the suit. That holding does not purport to limit the right to relief against a fiduciary to situations in which he has committed concealed fraud. In Wofford v. Wofford, *supra,* the fiduciary was held liable although there was no fraud or misrepresentation. 142 So.2d at 194. *See also* Adcock v. Merchants & Manufacturers Bank, *supra.* In the instant case the District Court elected to use gentler words than fraud, but if fraud is a requisite it was present here.[6]

> [A]s between persons sustaining a fiduciary or trust or other confidential relationship toward each other, the person occupying the relation of fiduciary or of confidence is under a duty to reveal the facts to the plaintiff (the other party), and that his silence when he ought to speak, or his failure to disclose what he ought to disclose, is as much a fraud at law as an actual affirmative false representation or act.
>
> . . .

Van Zandt v. Van Zandt, 227 Miss. 528, 86 So.2d 466 at 470 (1956) (holding that a cotenant having powers of attorney from the other owners was their agent in consummating a sale of timber from the land and was a fiduciary, required to exercise loyalty and good faith and to report to his principals the fact of the sale and to pay over their share of the proceeds).

The response of appellants to the fiduciary issue is twofold. First, they say that Hamilton was not a manager as in *Wofford,* or an agent as in *Minor,* or a tenant in common and agent as in *Van Zandt.* Hamilton could be characterized as a "manager" as in *Wofford* though with fewer managerial duties and less stringent fiduciary obligations. One could describe him as an "agent" as in *Minor,* though with fewer duties as agent and fewer burdens as fiduciary. And he can be termed as "agent" as in *Van Zandt* though less formally authorized. But dialogue such as this misses the mark. The existence of fiduciary obligations is not limited to "conventional" forms and does not turn on rubrics. Ham v. Ham, *supra;* Risk v. Risher, *supra;* Sojourner v. Sojourner, *supra.* It is clear beyond cavil that if the same arrangement had been made but Hamilton were a cotenant with his brother, Hamilton owning ¹⁄₁₀ and Elbert ⁹⁄₁₀, Hamilton would be a fiduciary.

> Because of the mutuality of their interests, possession and obligations, the relationship between cotenants is confidential and fiduciary in nature. Each has a duty to sustain, or at least not to assail, the common interest, and to sustain and protect the common title.

Nichols v. Gaddis and McLaurin, Inc., 222 Miss. 207, 75 So.2d 625, 629, 78 So.2d 471 (1974); *Guiseppe III, supra.* Lacking the ¹⁄₁₀, he is no less bound to deal fairly and honorably with his brother.

Appellants' second response is that if there were a fiduciary relationship it terminated upon Elbert's death and Hamilton owed no obligation to the widow. This is discussed in part 3, *infra.*

---

**6.** The facts that require a conclusion of fraud are dismissed in part 4, *infra.*

### 2. Hamilton's obligations as fiduciary.

Fiduciary relationships are of varying degrees of dignity, and some impose more stringent obligations than others. 5 Scott § 495 at 3534. We need not define the outer limits of Hamilton's obligations with respect to his absent brother and to the land that was the subject of their arrangement. At a minimum he was under several duties that dispose of this case. He was under a duty of loyalty to his brother, to act to Elbert's benefit and not to profit at his expense. Restatement §§ 2(b), 170 and Comment a; 1 Scott § 2.5 at 39; 5 Scott § 495 at 3534. He had a duty to administer the subject matter solely in Elbert's interest. Restatement § 170(1) and Comment a. He was under a duty to use reasonable care and skill to protect the property that was the res of the relationship. Restatement § 176; 2 Scott § 176. He may not compete with the beneficiary in the acquisition of property. 5 Scott § 504. It is but to state the obvious to say that Hamilton could not in derogation of duties such as these claim as his own the land that was the subject matter of the relationship of trust and confidence.[7] A fiduciary who has acquired a benefit by a breach of his duty as fiduciary is under a duty of restitution to the beneficiary. Restatement of Restitution § 138.

A fiduciary is required to supply information to the beneficiary concerning administration of the trust only upon request. See Restatement § 173. But the law of trusts, embracing as it does both common sense and honorable dealings, applies a different rule where the fiduciary's personal interest collides with his duty to the beneficiary. If he deals with the beneficiary on his own account he is under a duty "to deal fairly with him and to communicate to him all material facts in connection with the transaction which the [fiduciary] knows or should know." Restatement § 170.[8] See also Van Zandt v. Van Zandt, quoted supra.

It is immaterial that Hamilton made no promise to Elbert of specific duties that he would carry out. The consequences of a fiduciary relationship flow from the relationship as a matter of law. 1 Scott § 2.5 at p. 40.

### 3. Hamilton is a fiduciary for the widow.

Appellant's second response to the District Court's view of Hamilton as a fiduciary is that even if he were under fiduciary obligations to his brother the relationship was terminated by Elbert's death, and Hamilton had no duty to the sister-in-law that his counsel describe as "a native Honduran woman" . . . "whom he never knew, never saw and only heard of through the [United States] Consul." This could not be more wrong. Upon the death of Elbert, his rights as the beneficiary of a fiduciary obligation descended to his widow in the same manner as did the land itself. Miss.Code Ann.1972, § 91–1–9; Restatement § 142.[9]

7. He could not even purchase the property at a sale, foreclosure or otherwise, even though he paid a fair consideration, because this would place in conflict his personal interest and his duty as fiduciary. Restatement § 170, Comment b; 2 Scott § 170.2. It would be strange indeed if, without paying anything, he could by silence maneuver himself into ownership of that which he could not purchase at a fair price.

8. The principles here involved are parallel to those of the law of adverse possession. One who has come into possession permissively must evidence his intent to claim adversely by acts of occupation sufficient to demonstrate hostile possession. As the trial judge noted in this case, permissive occupation is so usual by persons in familial relationships that acts which might be sufficient to demonstrate to strangers hostile possession may not be sufficient with respect to family members. Similarly, before a tenant can claim adversely against his cotenants there must be "ouster" by actual knowledge to the cotenants, or the equivalent. See discussion of Guiseppe III, in part 1, supra.

9. Hamilton was a fiduciary with respect to the widow for another reason also. Although there was no administration of Elbert's estate in Mississippi and Hamilton had no status as representative thereof, he purported to act as representative. He changed the tax assessment to read "E. J. McGowan estate" and until 1968 taxes paid by him were shown on

If a beneficiary of a trust dies intestate, and if his interest does not terminate on his death, the devolution of his interest is governed by the same rules of descent and distribution as govern the descent and distribution of a corresponding legal interest. . . . [I]f the trust property is real estate, the interest of the beneficiary passes to his heirs. (Footnotes omitted.)

2 Scott § 142.

Hamilton continued in possession of the land, enjoying the use and profit, and ·assessing it in the name of the estate of which the widow was the sole beneficiary (subject to the "three-year plus reasonable prolongation" provision of the treaty). The courts have· characterized in varying ways the precise interest of the alien in circumstances such as those before us. The appellants refer to it as a fee simple determinable.[10] Whatever its precise character, the widow had an interest in the land, commencing at her husband's death and extending thereafter for three years plus any reasonable prolongation thereof. With respect to her interest Hamilton continued to be a fiduciary as he had been for her husband.

As with respect to Elbert, the maximum perimeters of Hamilton's obligations to the widow need not be marked. Under the narrowest, most minimal standards of faithfulness, fair dealing and the trust and confidence that undergird fiduciary relations, Hamilton was bound to notify her that he was a fiduciary of certain land in which she had a [fee simple determinable] interest and that she was now the beneficiary of the obligations which he owed with respect to the land and to the owner thereof. Notice to her and action by her was the

the records as received from that estate. Whatever his precise legal status, as the person in possession of the decedent's property pursuant to an agreement with the decedent and holding himself out as authorized to act on behalf of the estate, he was under fiduciary obligations to the heirs of that estate.

**10.** "There is much discussion in the cases as to the nature of the title which nonresident

only way in which the interest to which his obligations attached could be preserved from destruction, for he had no power to sell for her. He would have been obligated to give her notice of circumstances that might cause her to lose her rights to a stranger. "No one is required to watch the clerk's office to see that those in possession of property in privity with him or in subordination to his title are not acquiring rights adverse to him." Nichols v. Gaddis and McLaurin, *supra*, 75 So.2d at 633. Inarguably he was compelled to inform her that if she failed to timely act he intended to deal with the res for his own account and adversely to her by himself claiming as an heir of his brother. Van Zandt v. Van Zandt, 86 So.2d at 470, quoted *supra*; Restatement § 170(2).

The situation here is similar to that in which the subject matter of a fiduciary relationship is a leasehold interest. The fiduciary may not secure a renewal of the lease for his own benefit. Risk v. Risher, *supra*; 2 Scott § 170–21. Like a fiduciary-lessee in possession and seeking a renewal for himself, Hamilton draws his right to possession from someone other than the beneficiary; also he made no effort to "evict" his beneficiary by terminating his relation with her during the "term"—in her case three years—but sought, and secured, through channels independent of her and without notice to her, the interest available upon the termination of her interest.

### 4. Hamilton's breach of fiduciary obligations.

From his brother's death in 1957 until this suit was filed in 1971, Hamilton made no attempt to communicate with the widow, although he had been in-

aliens held under the terms of this treaty. Some authorities denominate it a base or qualified fee, and others as a determinable fee. The terminology is not of controlling importance."

Pierson v. Lawler, 100 Neb. 783, 161 N.W. 419, 420 (1917).

formed of her status and her name and address by an official report sent to him in 1957 by the U.S. consul in Panama. His lame explanation that he didn't believe that his brother was married was no explanation at all, and the District Court so treated it. Even if he was unwilling to believe that his brother had married "a native Honduran woman," he knew the name, address and identity of the person who held herself out to be Elbert's wife, and who had been accepted by the United States Consul in Panama as Elbert's wife for purposes of the Consul's Report [11] and to whom his personal effects had been turned over.

The result in this case would be the same if Hamilton's failure to inform the widow were done without improper intent. But we are not left to guess at his intent. His daughter, an experienced businesswoman, handled payment of the taxes for him. Beginning around 1951 she had attempted, but unsuccessfully, to have the assessments changed from Elbert's name to her father's.

In 1968 Hamilton filed his "confirmation suit" in Mississippi state court claiming title by adverse possession to the land. The District Judge referred to this as an "attempted divestiture of the widow". At no time had he given notice to the widow that he intended to claim adversely the land that for half a century he had held permissively. See footnote 8, *supra*. Hamilton named as parties to the suit his brothers and sisters, the widow of a deceased brother other than Elbert, and "unknown heirs, if any of E. J. McGowan." Elbert's widow was not named as a party. Process was had on various named defendants, their addresses having been given. The remaining process was by publication addressed to "unknown heirs, devisees and executors, if any of E. J. McGowan deceased,

whose whereabouts, places of residence and post office addresses are unknown." At this time, the District Court found, Hamilton "made no effort to locate [the widow], or have process directed to her by name at her last known address." Also, as the trial judge found, he did not allege, as required by Mississippi law, Warren v. Clark, 230 Miss. 873, 94 So.2d 323 (1957), that he had joined all parties interested in the land so far as they were known to him and could be ascertained by diligent inquiry. Such an allegation would have been false.

Hamilton took a default judgment in the confirmation suit. The assessment to 27 of the 37 acres [12] was changed shortly thereafter from "E. J. McGowan estate" to Hamilton's name. Oil had been discovered on the land at a date not revealed by the record. Beginning in late 1958 and continuing to the filing of this suit Hamilton participated in a series of oil leases, royalty contracts, and similar documents relating to the property in question. Elbert's widow died in 1969. Around 1970 the heirs of the widow, residents of Honduras, learned of the land through persons interested in oil development. Thereafter the widow's sister brought this suit. In the District Court Hamilton claimed a parol gift of the land but wholly failed to establish it, and the appellants have abandoned that claim.

The facts here are remarkably parallel to those in *Guiseppe*. There the nephews and nieces in Italy were uneducated people who knew nothing of the United States and its courts and legal records. The "native Honduran woman" of this case had a fifth grade education, and spoke little, if any, English and, so far the record discloses, knew nothing of her husband's 37 acres in Mississippi. In each case a knowledgeable resident was

---

11. Report of the Death of an American Citizen, Form FS-192. Under familiar evidentiary rules this official certificate would almost certainly be admissible in a court, against hearsay objections, to prove the truth of the matter asserted therein, a much higher

threshold to pass than that for notice necessary to trigger the attention of a fiduciary.

12. There is no explanation of why the assessment on the other ten acres was not changed.

on the scene in Mississippi.[13] In both cases the resident with no notice to the distant members of his family, attempted to claim adversely to them. In both cases the resident employed state court procedures as a device to exclude his alien relatives. In *Guiseppe* the son affirmatively misrepresented in the state court suit. In this case Hamilton omitted an element of pleading that would have required that he reveal the facts or swear falsely. The Mississippi Supreme Court, in *Guiseppe III,* 193 So.2d at 553, treated with unconcealed disdain the failure of the resident to carry out his duty of diligently seeking out heirs in Italy.

The District Judge in this case found that the state court confirmation suit did not deprive the widow of her interest because as a matter of law Hamilton's permissive use and possession of the land was not adverse at least until 1957, and because due process was violated by failure to give her notice of the suit. The court then found with respect to the three-year period provided by treaty that "until [the widow and her heirs] were made aware of their interest, *the circumstances were such* as to require a prolongation of the three year period in which to divest themselves of their inherited interests" (emphasis added), and that plaintiff had filed this suit within a reasonable time after she learned of her interest.

As I understand Judge Coleman's analysis it is this: the widow loses, but not because of the judgment in the confirmation of title suit, the validity (or lack of) which he does not discuss. She loses because she failed to sell her interest within three years and it terminated by operation of law in 1960. Title fell like a ripe peach into the lap of Hamilton, not under the judgment in the confirmation suit but because he was the sole remaining heir of Elbert entitled to take.[14] Judge Coleman declines to "reasonably prolong" the three-year period because the widow knew that her husband had family in Mississippi and could have inquired, and, in any event, she was put on notice of her husband's ownership by the Mississippi public records.

Uniformly the courts agree that what is an allowable period in which the alien must dispose of his interest, whether under a statute calling for "reasonable time," or one calling for a term of years, with a "reasonable prolongation," requires case by case analysis of the circumstances. Scharpf v. Schmidt, 172 Ill. 255, 50 N.E. 182 (1898) (commencement of suit for partition two and a half years after alien's death held to comply with two years plus reasonable prolongation); Ahrens v. Ahrens, 144 Iowa 486, 123 N.W. 164 (1909) (50 years after alien's death held outside of "reasonable time" statute where no "excusing facts or circumstances" existed); Pierson v. Lawler, 100 Neb. 783, 161 N.W. 419 (1917) (same treaty provision as at bar, alien failed to prove circumstances showing necessity for prolongation of eight years). Fischer v. Sklenar, 101 Neb. 553, 163 N.W. 861 (1917), points out that the original and specific term of a treaty providing for such a term plus reasonable prolongation merely prevents the state from limiting the term to a shorter period. To refuse to permit such further time as is reasonable "would, for all practical purposes, render this [prolongation] provision of the treaty nugatory, while like any other instrument, it should be construed to give it practical effect rather than to make it ineffectual."[15] *Id.*

---

**13.** For many years Hamilton, in addition to farming, had engaged in securing and putting together oil leases.

**14.** Under § 91–1–3 Miss.Code Ann.1972, the brothers and sisters of Elbert would inherit. Some or all of those other than Hamilton appear to have deeded their interests to him.

In any event, the confirmation suit appears to have been valid with respect to them.

**15.** Modern cases hold that after the treaty period has run its course the alien's estate is defeasible as against the state, and subject to be defeated by an action to declare the property escheated. Until the action is brought

I find no other case involving similar treaty provisions in which the issue of breach of fiduciary relationships has been presented. In Miller v. Clausen, 299 F. 723 (CA8, 1924), relied upon by Judge Coleman, the decedent died in 1911, the owner of Nebraska land, leaving a sister Catharina, residing in Nebraska, and a father, brothers and sisters, and other kin, all residing in Germany. The father, Hans, died in 1916, having failed to exercise his treaty-given right to sell, which was for a reasonable time after the death of the decedent. The Alien Property Custodian seized the property in 1919. Catharina filed a petition in Nebraska state court in 1922 for a decree of heirship, and that court entered a decree that she was the only heir of decedent qualified to take title to the real estate. She then sued the Alien Property Custodian for possession of the property. The Eighth Circuit rejected the Custodian's argument that Catharina took, if at all, by inheritance from the father so that his title having failed, she took nothing, and held that she took directly as the heir of decedent. No contention was made that Catharina was in a fiduciary relationship to her father or her German kin.[16]

The District Judge in this instance made the factual analysis that the case law requires, and found that the widow had no knowledge of: (a) the provisions of the treaty, (b) her inheritance, and (c) "the attempted divestiture" [by Hamilton], nor did her heirs have such knowledge. He concluded that a prolongation was required, and that it should extend until the heirs had knowledge of their interest. Without a tip of the hat to the plainly erroneous rule, Judge Coleman reverses these findings and holds that no extension was necessary.

His conclusion of no necessity for prolongation has two bases, the duty of the

widow to inquire whether her husband owned Mississippi land and the constructive notice to her by the Mississippi recording statutes. The first founders upon the duty of the fiduciary-adverse claimant to tell her the facts. The recording act argument was advanced by the fiduciary in *Guiseppe* and rejected by the Mississippi Supreme Court:

> All of the nephews and nieces of Frank Toney, except Mary Cozzani, lived in the Republic of Italy, at the time of his death in 1896. They, thus, lived some 4,000 miles from the shores of the United States. They were uneducated people who knew nothing about the United States, its laws, its courts and its legal records. How could this Court or any court hold that these illiterate people, 4,000 miles away, were given actual notice or the equivalent thereof by the filing of pleadings and deeds in the Warren County Chancery Clerk's Office in Vicksburg, Mississippi?

*Guiseppe III, supra,* 193 So.2d at 554. We find no comparable case in which recording acts have even been considered as a relevant factor. Necessarily the cases will often concern aliens who by reasons of distance, family separation, language, and educational barriers, do not know of their interests in land in the United States and are delayed in learning. To give to the local recording acts the effect proposed by Judge Coleman substantially erodes the possibility for "reasonable prolongation" in such cases and makes the prolongation provision of limited utility. *See* Fischer v. Sklenar, *supra.*

The three-year provision of the treaty implements state policies against alien ownership of land and in favor of repose of land titles. The constructive trust is

the alien retains the power to convey title good against the world. Dutton v. Donahue, 44 Wyo. 52, 8 P.2d 90 (1932); Abrams v. State, 45 Wash. 327, 88 P. 327 (1907); Louisville Ins. Co. v. Comm., 147 Ky. 72, 143 S.W. 1044 (1912).

16. Assuming the Custodian would have had standing to raise such an issue, there is no mention of any fiduciary relationship during decedent's lifetime and upon his death an administrator was appointed and took possession of the property, although Catharina was permitted to live on it.

the usual equitable means of enforcement against the fiduciary who has secured for himself a benefit that in fairness and honorable dealings belongs to his beneficiary. Sojourner v. Sojourner, *supra*; Adcock v. Merchants & Manufacturers Bank, *supra*; Restatement of Restitution §§ 160, 190, 199, and see also § 195; Restatement § 1(e). A declaration that Hamilton holds legal title but as constructive trustee for the widow, with a duty to account to her, will vindicate her interest with respect to the past. It will vindicate the interest of the state to repose of title.[17] Under the circumstances the interest of the state against alien ownership of land will be protected by a requirement that the widow dispose of her equitable interest within three years (plus reasonable prolongation) of the end of the litigation declaring her interest.

I have discussed this case under the law of fiduciary relationships and trusts. Precisely the same consequences attach, however, if it is approached in terms of a confidential relationship, which can exist where there is no fiduciary relation, and particularly arises between persons in a familial relationship where one reposes confidence in the other and such other abuses the confidence placed in him. 1 Scott § 2.5. The same result also ensues if one applies plain vanilla estoppel.

I have no doubt that the courts of Mississippi, like the Mississippi federal District Judge, would not permit this fiduciary to enrich himself by the abuse of a position of trust within his family. I respectfully dissent from the majority opinion which does permit that unfortunate and inequitable consequence.

17. In *Guiseppe,* 25 years had elapsed since the Italian nieces and nephews acquired title. During that time the Mississippi niece had sold off three parcels of land and granted a utility easement. The Supreme Court remanded for an adjudication of respective ownership interests and an accounting of net rentals and sale proceeds from 1933 to 1967, the date of the decision.

*See also* Sojourner v. Sojourner, *supra,* in which the Mississippi court held that, if the obligations were proved, the brother's widow, who held legal title by inheritance from her husband, would hold as constructive trustee for the sister.