**CARTER EQUIPMENT COMPANY, et al., Plaintiffs-Appellees Cross-Appellants,**

v.

**JOHN DEERE INDUSTRIAL EQUIPMENT COMPANY, Defendant-Appellant Cross-Appellee.**

No. 80–3877.

United States Court of Appeals, Fifth Circuit.

July 29, 1982.

Rehearing Denied Aug. 26, 1982.

Erskine W. Wells, J. Jerry Langford, Jackson, Miss., for defendant-appellant cross-appellee.

Kenneth A. Rutherford, Jackson, Miss., Jack N. Price, Austin, Tex., for plaintiffs-appellees cross-appellants.

Before WISDOM, JOHNSON and WILLIAMS, Circuit Judges.

JOHNSON, Circuit Judge:

Plaintiff, Carter Equipment Company (Carter), sued defendant, John Deere Industrial Equipment Company (Deere), originally alleging seven causes of action.[1] Ultimately, only two causes of action were submitted to the jury. The first cause of action related to Carter's claim that a fiduciary relationship existed between the parties and that Deere had breached its fiduciary duty. The second cause of action related to Carter's claim that Deere was a de facto trustee, or trustee in fact, of the repossession reserve account and that it had breached that trust.

The jury returned a verdict in the amount of $1,000,000 and judgment was entered accordingly. Deere filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. The district court overruled the motion after oral argument. This appeal followed. This Court reverses the judgment of the district court and remands the case for a new trial.

I. *Facts*

In 1965, Carter and Deere entered into agreements that resulted in Carter's becoming an authorized dealer of Deere equipment in Natchez and Jackson, Mississippi. Subsequently, the parties entered into agreements establishing Carter dealerships in Greenwood, Meridian, and Starkville, Mississippi.[2] It is undisputed that the agreements constituted a franchising arrangement. During the early stages of the franchise relationship, Carter's business involved only a limited amount of Deere equipment. However, Deere equipment was Carter's major line by 1974.

In May of 1974, Deere held a worldwide meeting of Deere equipment dealers in Moline, Illinois. Dan Hyde, Carter's general manager, and Roy Carter attended the meeting. The purpose of the meeting was to introduce Deere's plans for significantly broadening its product line by introducing a number of new "ERA III" machines during the next five years. Remarks were made that Deere would double the number of offerings in seven product groups in hopes of more than doubling Deere's worldwide industrial sales within the five years. The record contains evidence that, in order to achieve its goals, Deere relied upon its dealers and "challenged" them to aggressively participate in the plan. In return for the dealers' increased efforts, Deere promised to provide the products and equipment necessary to challenge the marketplace.

Testimony at trial indicates Carter Equipment began planning new facilities to

---

1. The first cause of action alleged violations of the antitrust laws as set forth in 15 U.S.C.A. § 15. The second cause of action related to wrongful interference with business relations. Alleged fraudulent representations were the foundation for the third cause of action, and alleged duress was the basis of the fourth cause of action. The fifth cause of action involved a claim that Deere was a "de facto" trustee of Carter's repossession reserve account and that the trustee breached the trust. The sixth cause of action, which was raised in Carter's first amended complaint, alleged violations of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(a). Finally, Carter alleged, in a second amended complaint, that Deere's actions were, in certain instances, "a breach of the fiduciary duty which [Deere] owed to [Carter] as a result of the Dealer-Supplier Relationship entered into by the parties."

Prior to trial, Carter's first, third, and sixth causes of action were dismissed by a court order granting, in part, Deere's motion for summary judgment. Carter responded by filing an amended second complaint alleging the four remaining causes of action and an additional claim that Deere had breached implied warranties of merchantability.

At trial, the district court directed a verdict against Carter on the cause of action alleging wrongful interference with business relations and the cause of action alleging duress. The court also directed a verdict against Roy Carter individually. The record indicates Roy Carter owned 20% of the stock in Carter Equipment Company and was vice president of the company. He also managed one of the local dealerships.

2. The Starkville, Mississippi dealership was later moved to Columbus, Mississippi.

meet the challenge. However, fire almost totally destroyed Carter's physical facilities in Jackson, Mississippi in 1975. Consequently, Carter began the construction of a new facility. Carter alleges the new facility was built, at least in part, in anticipation of the new line of equipment from Deere. In any event, it is undisputed that the facility far exceeded Carter's needs or capacity at the time it was built. It is also undisputed that the project created financial difficulty for Carter.

About this time, Dan Hyde was fired by Carter, creating a problem in the company's management. A replacement for Hyde was hired approximately eight months later, but he too was fired after a few months.

Carter's financial difficulties continued; it fell behind and was in default on accounts with suppliers and manufacturers. Carter asked Deere to release Deere's security interest so the items utilized as collateral for the security interest could be used to secure other loans. Deere refused. On November 3, 1977, Deere notified Carter it was terminating the dealership agreement in 120 days. During this time, Carter approached various prospective purchasers. At one point, it appeared Norwel Equipment Company would purchase the Carter dealership. Deere would not approve of Norwel as a dealer of Deere equipment for the area serviced by Carter.[3] Ultimately, the business was sold to the Hughes-Henry Equipment Company on February 1, 1978. According to Carter, the sale was made at a substantial loss.

## II. *Deere's Claims*

As noted, the case went to the jury on only two of Carter's causes of action. Deere claims error relating to both. This Court will address the fiduciary duty issue first and the "de facto" trustee issue second.

### A. *Fiduciary Duty*

■ The question of whether Carter and Deere enjoyed a fiduciary relationship is perhaps the central issue of the case *sub judice*, since the jury appears to have based most of its million dollar damage award on a perception that Deere breached some fiduciary duty owed to Carter.[4] The cause of action, as it appeared in Carter's final complaint, stated: "The actions of Defendant toward Plaintiffs ... constitute a breach of the fiduciary duty which Defendant owed to Plaintiff Carter Equipment Company as a result of the Dealer-Supplier Relationship entered into by the parties." The district court recognized that, because this case was based on diversity jurisdiction, the Mississippi state law was the law of decision. The district court noted that it was contrary to his experience to impose a fiduciary relationship in a case, such as the one *sub judice*, involving written contracts that expressly set out the relationships between the parties. The district court, however, relied upon a Mississippi Supreme Court case, *Parker v. Lewis Grocer Co.*, 246 Miss. 873, 153 So.2d 261 (1963), that the court believed "alligned Mississippi with a view completely at variance with [the district court's] own views and experience on the subject."

Deere contends this determination, together with the submission of a jury instruction relating to a possible fiduciary relationship, was error. The basis of Deere's argument is that the contracts entered into by Deere and Carter controlled the entirety of the parties' relationship. On the other hand, Carter contends that, while Mississippi law does not recognize every franchise or contractual relationship as giving rise to a fiduciary duty, the facts of the

---

**3.** As will be noted later, Norwel was already the Deere dealer for a part of the State of Louisiana. Deere contends it was unwilling to enter into dealer agreements with Norwel for the locations Carter operated because Deere would be dependent upon Norwel for a very large, contiguous area that covered most of the states of Louisiana and Mississippi.

**4.** The only other cause of action submitted to the jury related to depletion of Carter's reserve account. As will be noted in greater detail, this claim was limited to a maximum of $105,-836.35. Consequently, it is true, as Deere argues, that the jury's one million dollar verdict must have been based primarily on the cause of action that alleged a breach of a fiduciary duty.

present case clearly suggest Deere owed a fiduciary duty to Carter.

Mississippi applies a broad brush to the equitable doctrine of the fiduciary and does not preclude a jury's finding a fiduciary relationship exists between a franchisor and franchisee. To the contrary, the case referred to by the district court—*Parker v. Lewis Grocer Co.*—indicates Mississippi law would indeed recognize a fiduciary relationship in an appropriate situation. *Parker*, which relied upon a prior Mississippi Supreme Court decision, *Risk v. Risher*, 197 Miss. 155, 19 So.2d 484 (1944), emphasized the Mississippi Supreme Court's position that fiduciary obligations may arise outside the conventional boundaries traditionally recognized as giving rise to fiduciary relationships. *See DeTenorio v. McGowan*, 510 F.2d 92 (5th Cir. 1975) (Godbold, J. dissenting); *Ham v. Ham*, 146 Miss. 161, 110 So. 583, 584 (1926).

The Mississippi Supreme Court held that the facts involved in *Parker* created a fiduciary relationship between a landlord and tenant, even though the parties' underlying relationship was contractual.[5] The court pointed out that "the relation is not restricted to such confined relations as trustee and beneficiary, partners, principal and agent, guardian and ward, managing directors and corporation, etc. . . . *It applies to all persons who occupy a position out of which the duty of good faith ought in equity and good conscience to arise.*" *Parker*, 153 So.2d at 275–76 quoting *Risk* (citations omitted) (emphasis in *Parker*). The court went on to state:

> Wherever one person is placed in such a relation to another by the act or consent of that other, or by the act of a third person, or of the law, that he becomes interested for him, or interested with him, in any subject of property or business, he is in such a fiduciary relation with him that he is prohibited from acquiring rights in that subject antagonistic to the person with whose interests he has become associated.

*Id.* at 276 (*quoting Risk*) (emphasis in *Parker*).

The language of the Mississippi Supreme Court indicates that, under Mississippi law, a fiduciary relationship may encompass, in certain instances, a relationship based upon a contractual agreement. Ordinarily, courts do not impose fiduciary duties upon parties to contractual agreements. Accordingly, Mississippi law does not dictate that out of every contractual—or franchising—arrangement a fiduciary relationship arises. The Mississippi Supreme Court teaches that the relationship of franchisor/franchisee does not negate the possibility the parties may also be fiduciaries. A fiduciary relationship may arise, if the appropriate facts are present.

The existence or nonexistence of a fiduciary relationship between parties is a question of fact for the jury.[6] As such, the jury must be given guidance regarding when such a relationship exists. At the outset, "[i]t is the nature of the relation which is to be regarded, and not the designation of the one filling the relation." *Parker*, 153 So.2d at 276 (*quoting Risk*). The court in *Parker* provided guidance regarding the genesis of a fiduciary relationship by stating that one of the parties will not

---

5. *Parker*, like its predecessor *Risk*, involved a landlord/tenant arrangement. Parker, who owned a large amount of land that supported a shopping center, leased a certain part of the property to a tenant for the purpose of conducting a supermarket business. "Under the covenant the [tenant] agreed to use the demised premises for supermarket purposes only, and the [landlord] agreed not to use himself, or to lease to any other person, any space in Maywood Shopping Center, or any addition to or extension, for a supermarket." *Parker*, 153 So.2d at 263. The tenant paid for the use of the premises by an annual percentage of his gross sales, or, if the percentage were lower than a fixed amount, the tenant paid the fixed amount. At some point in time, the landlord leased other property to another tenant for the purpose of conducting a supermarket business.

6. Since the issue is one for a jury to decide, this Court declines to adopt the Eighth Circuit's conclusion that "[i]nherent in a franchise relationship is a fiduciary duty." *Arnott v. American Oil Co.*, 609 F.2d 873, 881 (8th Cir. 1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272.

be permitted to "frustrate the *mutual purposes* of the parties or drive the [other party] from the business world." *Id.* at 275 (emphasis added). In other words, the parties must have mutual or shared intentions.[7] A fiduciary relationship arises only if the activity of the parties goes beyond their operating on their own behalf and the activity is for the benefit of both.

■ *Arnott v. American Oil Co.,* 609 F.2d 873 (8th Cir.), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1979) provides further guidance in the particular context of franchising arrangements.[8] The Eighth Circuit recognized the need for mutual or shared purposes, and indicated that such intentions were demonstrated through proof that "both parties have a common interest and profit from the activities of the other."[9] *Arnott,* 609 F.2d at 881. Of course, mutual or shared purpose gives rise to, and is demonstrated by, "trust or confidence placed by one person in the integrity and fidelity of another person." *Id.* at 881 n.6. Indeed, whether the parties repose trust or confidence in one another is critical to an ultimate determination regarding the existence of a fiduciary relationship.

■ In addition to the goals of the parties and the requisite need for trust or confidence in one another, the nature of the agreement between the parties may provide evidence that a fiduciary relationship exists. If the franchisor has power to control the franchisee, there is an increased likelihood that a fiduciary relationship exists, since trust or confidence necessarily must flow from the controlled or dominated party. As a result, the power, authority, and bargaining position of *both* the franchisor and franchisee becomes critical. If both parties stand on equal or nearly equal footing, there is less likelihood a fiduciary relationship exists, since equity will not be necessary to protect a party.[10]

■ Although Mississippi law recognizes the existence of a fiduciary relationship as a possible outgrowth of a franchising arrangement, it is apparent that the district court erred in instructing the jury regarding what might constitute a breach of such a relationship. The district court instructed the jury:

> Therefore, if you find from a preponderance of the evidence in this case that such a fiduciary relationship did exist between Carter Equipment Company and John Deere Industrial Equipment Company, and that John Deere breached any of its duties under that relationship, and if you further find from a preponderance of the evidence that such violation or breach of the fiduciary relationship was a proximate cause of damages to Carter Equipment Company, then you must find in favor of Carter Equipment Company and award damages according to the evidence and the instructions given you by the Court.

7. It is, of course, beyond peradventure that, although parties may share certain goals and even be fiduciaries, they also have individual interests and intentions.

8. Proof of the intimacy of the relationship between the parties may come from a variety of sources. This Court merely attempts to provide illustrations of the type of evidence that could lead to the conclusion a fiduciary relationship existed in Mississippi in a given context.

   Of course, this Court recognizes *Arnott* has characteristics that distinguish it from the specific case *sub judice,* and does not adopt the Eighth Circuit's holdings in *Arnott* as the law of this Circuit. It merely acknowledges *Arnott* as instructive with regard to when a fiduciary relationship may exist in the context of franchising arrangements, which Mississippi law apparently recognizes.

9. It appears that at least one of the facts that might distinguish a franchising agreement from a typical contractual arrangement is that it involves a functioning and continuing enterprise.

10. Deere cites several cases in support of its position that inequality between the parties does not give rise to a fiduciary relationship. The Court has reviewed these cases and finds they teach that, without other contributing factors, inequality does not give rise to a fiduciary relationship. In other words, the relative equality of power between the parties may be a factor in determining whether a fiduciary duty exists.

Deere contends, and this Court agrees, the substantive instruction is erroneous since it fails to provide any guidance regarding what might constitute a breach of the fiduciary duty.[11]

*Parker* indicates a fiduciary has the generalized obligation of dealing fairly and in good faith.[12] More specifically, the cases addressing fiduciary duty demonstrate that a breach of the duty arises when one party breaches the others trust or confidence by affirmatively acting in a way that produces the other party's loss.[13] The rule is that a party breaches his fiduciary duty by actively utilizing some power, control, or opportunity to destroy, injure, or gain a preferential advantage over the party with whom it has a mutual interest. The parties have a mutual interest, by definition. As a result, there is an obligation not to affirmatively undermine one another. This does not mean a party must take unnecessary risks or forego seeking its individualized interests pursuant to their bargain.[14] It merely prohibits affirmative misconduct.

The instruction approved by the *Arnott* court effectively conveys the nature of a breach of a fiduciary relationship:

> Out of such a [fiduciary] relation, the law requires that neither party exert undue influence or pressure upon the other, take selfish advantage of his trust or deal with the subject matter of the trust in such a way as to benefit himself or prejudice the other except in the exercise of the utmost good faith and with the full knowledge and consent of the other person involved.

In summary, the district court did not err in submitting a cause of action pertaining to a fiduciary obligation. The court did err, however, in failing to instruct the jury properly regarding what constitutes a breach of such a duty.[15]

### B. *Deere As De Facto Trustee*

■ The only other cause of action submitted to the jury was labelled by Carter as "Breach of Trust and Deliberate and/or In

---

11. The significance of the error is magnified by the fact the district court exonerated Deere for many actions that may have formed the basis for arguing it engaged in affirmative misconduct. This exoneration came in the form of directed verdicts against Carter and particular preemptive jury instructions that precluded a finding in Carter's favor. For example, the district court instructed the jury,

> You are further instructed that there has been no credible evidence upon which to base a jury finding that the new facilities in Jackson were made under duress and upon the threat of cancellation of the John Deere Dealer Agreement with plaintiff, and, therefore, the Court instructs you that you shall not return any verdict for damages allegedly caused by such alleged duress on the part of the defendant with respect to the construction of said facilities.

12. Good faith and fair dealing are not customarily equated with a fiduciary duty. Mississippi, however, seems to merge the two concepts, at least in a broad sense.

13. In *Parker*, a landlord violated the trust of his tenant by leasing additional land to another tenant for use in a supermarket business. In *Arnott*, there was evidence the franchisor terminated the franchisee's franchise in retaliation for his selling competitor's products and refusal to follow illegal instructions on pricing. The *Risk* case involved a landlord/tenant relationship in which the tenant sublet an apartment.

At a later date, the sublessee went to the landlord and sought a new lease, which he was given. This activity by the original landlord and the sublessee effectively cut the original lessee out of the arrangement.

14. If the parties, in seeking their individualized interests, comply with the terms of a contract in which they are also parties, it would be difficult to find a breach of a fiduciary duty. Although fiduciaries have mutual interests, they also have individual goals. If part of their relationship is set out in a contract, the parties have affirmatively recognized, in part, those individual interests. Unless the contractual terms are unconscionable, illegal, or violative of public policy, fiduciaries, as a practical matter, acknowledge that activity in conformance with the terms of the contract cannot amount to misconduct that constitutes a breach of a fiduciary duty. *See generally Corenswet, Inc. v. Amana Refrigeration Co., Inc.*, 594 F.2d 129 (5th Cir.), *cert. denied*, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979).

15. Deere also complains that Carter failed to establish any causal link between Deere's conduct and Carter's financial losses. This complaint may be resolved upon remand by assuring that the instruction relating to the breach of a fiduciary duty, if any, insures that the losses suffered by Carter must be attributable to the affirmative misconduct of Deere.

[sic] Negligent Depletion of Reserve Account." The reserve account arose from a mechanism for financing sales of Deere equipment. Basically, Carter's customers could finance the purchase of equipment with Deere. The Carter reserve account was a repository in which Deere deposited a portion of the money Carter normally would have received from payments by the customers to Deere for the purchased equipment. If a customer defaulted, Deere would repossess the equipment and, in some instances, sell it to someone else. Deere then would charge any losses it suffered against the reserve account.

The record indicates that, from some time around November 1977 until the month prior to trial, $105,836.35 had been charged by Deere against Carter's reserve account. Carter sought this amount in damages for Deere's alleged mishandling of the reserve account. In this regard, the district court charged the jury:

> You are further instructed that under the law the defendant John Deere Industrial Equipment Company may be under a duty of trustee-in-fact, with respect to the Carter Equipment Company Repossession Reserve Account, if it were such a trustee that it had the duty to handle all repossessions prudently and properly to prevent or minimize loss to the Reserve Account. You are further instructed that the defendant, John Deere Industrial Equipment Company had a duty not to breach this trust, if any, and to either deliberately or negligently mishandle repossessions of equipment sold by Carter Equipment Company so as to unnecessarily cause losses to and to deplete the Carter Equipment Company Repossession Reserve Account.

The jury apparently found Deere was a trustee in fact and had breached its trust, since it returned a general verdict "FOR THE PLAINTIFF." Deere argues the resulting judgment of the district court should be reversed. Initially, Deere argues the district court should have directed a verdict against Carter on the Reserve Account cause of action. This Court, in the case of *Maxey v. Freightliner Corp.*, 665 F.2d 1367 (5th Cir. 1982) (en banc), recently re-emphasized the standard by which this Court and district courts in this Circuit determine whether there is sufficient evidence to submit a case to the jury in connection with motions for directed verdict. In *Maxey*, this Court relied upon the definitive case in this regard, *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (en banc).

> Under the standard established in *Boeing*, a motion for directed verdict or for judgment n. o. v. should be granted only when the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict. The court should consider all of the evidence—not just that evidence which supports the nonmovant's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fairminded persons in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury.

*Maxey* at 1371, *citing Boeing Company v. Shipman.*

In the case *sub judice*, the district court properly refused to grant a directed verdict on the reserve account cause of action. This Court finds there was substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach the conclusion Deere had acted imprudently with regard to the Reserve Account.[16] In-

---

**16.** To illustrate by example, Carter points this Court to the testimony of William B. Ford. Ford was a former customer of Carter, and testified he purchased Deere equipment financed by Deere. Ford testified he had mechanical difficulty with his equipment and asked Deere to trade it for similar equipment. After Deere refused, Ford offered Deere $25,-

deed, the jury did reach just such a conclusion.

Deere argues alternatively that the district court improperly instructed the jury by allowing it to decide whether Deere was a de facto trustee of a constructive trust. The foundation of this issue is the assertion that Mississippi law recognizes the creation of a constructive trust if there is an abuse of another's funds in a fiduciary relationship. *Sojourner v. Sojourner*, 247 Miss. 342, 153 So.2d 803, 807–08 (1963); *Russell v. Douglas*, 243 Miss. 497, 138 So.2d 730 (1962) *affirmed in part, reversed in part on other grounds*, 246 Miss. 771, 151 So.2d 197 (1963). *See also DeTenorio v. McGowan*, 510 F.2d at 103 (Godbold, J. dissenting). If a constructive trust is created, the trustee must handle the res prudently and properly.

On the other hand, if Deere and Carter were not fiduciaries, a constructive trust would not have been created. In such a case, the terms of the contract and the provisions of Mississippi's Uniform Commercial Code would control the handling of the res; Deere would be required to handle the res in a "commercially reasonable" manner. Miss.Code 1972, § 75–9–502(2).

The district court erred in its handling of the fiduciary relationship issue. It necessarily follows that it erred in its handling of the de facto trustee issue, since the existence of a constructive trust, in Mississippi, is dependent, at least in part, upon the existence of a fiduciary relationship. Consequently, this Court also remands the issue of whether a constructive trust existed in the case *sub judice* in order to assure the appropriate standard is applied to Deere's handling of the reserve account. If the jury finds no fiduciary relationship existed between the parties, then Deere should have handled the reserve account in compliance with the U.C.C. and the terms of the contracts. On the other hand, if a fiduciary relationship did exist, together with the other factors necessary to give rise to a constructive trust in Mississippi, Deere was obligated to handle the funds in the manner described in the district court's charge.

### C. *Deere's Remaining Claims*

■ Deere's remaining claims are essentially subsumed in the disposition heretofore made. It is noted, however, that the district court did not err by allowing Roy Carter to testify regarding the "worth" of the repossessed equipment. This is true even if the standard to be applied under the reserve account cause of action is "commercial reasonableness." Section 75–9–507(2) of the Mississippi Code of 1972, which is relied upon by Deere, states:

> The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not *of itself* sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

(emphasis added).

This language clearly reveals that Mississippi recognizes price, at least in some cases, to be a factor in determining commercial reasonableness. Therefore, if it is deter-

---

000 in cash settlement for the defective machine, if Deere would guarantee the machine for six additional months. Again, Deere refused, and Ford sued Deere. The suit resulted in a settlement. Deere obtained possession of the machine and subsequently sold the machine to another dealer for $20,000, or $5000 less than Ford had offered. Deere charged $8909.26 against the reserve account. This amount represented Deere's entire loss on the machine.

Such testimony, together with additional evidence introduced at trial, could result in a fair-minded person's concluding Deere callously refused Ford's offers when the defective machine was not functioning, since it felt it had nothing to lose. A reasonable jury could conclude Deere simply believed it could refuse to repair or guarantee the machine and also refuse Ford's cash offer of $25,000, sell the defective equipment later for less than it was worth, and charge the difference to Carter.

mined on remand that Deere was not a de facto trustee of the reserve account and, as a result, was governed by the terms of the contracts and the U.C.C., price cannot be the determinative factor, but it may be one factor.

Finally, this Court acknowledges Deere's complaint that the district court continually recognized objections to the admission of evidence as well taken or valid, but would overrule those objections anyway. Without determining whether such conduct resulted in cumulative prejudice, this Court determines that such an approach to valid objections to the admission of evidence is unnecessary and should be avoided on retrial.

### III. *Carter's Cross-Appeal*

On cross-appeal, Carter alleges the district court erred in three ways. First, Carter claims the district court erred by directing a verdict against Carter on its claim that Deere was guilty of tortious interference with contractual rights. Second, Carter claims the Court erred in instructing the jury concerning Deere's alleged breach of implied warranties of merchantability. Finally, Carter complains the district court erred in refusing to submit the issue of punitive damages to the jury.

■ At the outset, this Court determines the district court did not err in directing a verdict against Carter on the claim that Deere tortiously interfered with Carter's contractual rights. The appropriate standard to be applied is set out in the 1960 Mississippi case of *Irby v. Citizen's National Bank of Meridian*, 239 Miss. 64, 121 So.2d 118 (1960). In that case, the Mississippi Supreme Court commented, "A prima facie case of wrongful interference with a contract is made out if it is alleged (1) that the acts were intentional and wilful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, *without*

*right or justifiable cause on the part of the defendant* (which constitutes malice); and (4) that actual damage and loss resulted." *Id.* 121 So.2d at 119 (emphasis added). These requirements have been interpreted as establishing that "the interference complained of must be wrongful in order to be actionable and that any interference is not wrongful and actionable if undertaken by someone in the exercise of a legitimate interest or right." *Martin v. Texaco, Inc.*, 304 F.Supp. 498, 502 (S.D.Miss.1969), *citing id.*

Reviewing all of the evidence in the light most favorable to Carter, there is not substantial evidence such that a jury would reach a conclusion that Deere engaged in "wrongful" interference. Deere directs the Court's attention to evidence demonstrating it had a legitimate interest in not accepting Norwel as a buyer of the Carter business. The evidence indicates that, if Norwel had assumed the area of service by Carter, Deere would have been reliant upon one dealer to cover an extremely large, contiguous area. Guy Eaves, the designated representative of Deere,[17] explained Deere's position:

The decision to turn Norwel down was based on a management decision of several of us who had input to that decision. My input might be a little bit different in some respects than the Sales Department's input, since I deal primarily with finance. We all determined that there were too many reasons not to extend this franchise to Norwel Equipment Company. The Sales Department's primary reason was that it would constitute to Norwel much too large of a contiguous area and that effect on sales, as a dilution of the effectiveness of Norwel, as it was constituted at the time they were trying to extend themselves into Mississippi and virtually have two-thirds of the State of Mississippi. It was my contention from a finance point of view that the extension of additional territory to Norwel could easily increase their financial burden be-

---

**17.** Guy Eaves testified he had been with Deere for twenty-five years. His tenure with Deere began with his position as a sales and finance trainee. At the time of trial, he was manager of sales finance in the Central Region of John Deere Industrial Equipment Company. As such, he was in charge of all the finance, both wholesale and retail, at the regional level.

yond what was safe, and that I felt they were just getting their feet on the ground, they were doing an acceptably good job over in Louisiana, we were proud of that and we didn't want to put them in jeopardy. .

A lack of justification or cause for interfering with a contractual arrangement is a necessary element of a plaintiff's prima facie case. Carter provides no evidence that indicates Deere did not have a justifiable interest and reason for refusing to accept Norwel as a buyer of the Carter business. Accordingly, the district court's granting a directed verdict against Carter on the wrongful interference cause of action was not error. *See Frank Coulson, Inc.-Buick v. General Motors Corp.*, 488 F.2d 202, 205 (5th Cir. 1974) (interpreting Florida law); *Harrison v. Prather*, 435 F.2d 1168, 1173 (5th Cir. 1970); *Cranford v. Shelton*, 378 So.2d 652, 655 (Miss.1980); *Bailey v. Richards*, 236 Miss. 523, 111 So.2d 402 (1959).

■ Carter also argues on cross-appeal that the district court's instruction concerning Deere's alleged breach of implied warranties of merchantability was error. In this regard, the district court instructed the jury:

You are further instructed that the plaintiff is not entitled to recover any damages because of any alleged breach of any implied warranty of merchantability, since the plaintiffs failed to plead or prove that they had given the defendant notice of any such alleged breach within a reasonable time after Carter Equipment Company discovered or should have discovered the alleged breach, and since Carter Equipment Company continued, after the alleged breach had occurred, to order the machines in question.

Carter's argument is that the district court erred by not allowing the jury to determine whether Carter had properly notified Deere of alleged defects in the machinery and, as a result, preserve its claim that Deere

breached implied warranties of merchantability.

Mississippi Code Annotated § 75–2–607(3), together with its corresponding comments, provides the appropriate definition of notice. "[W]hether the notice requirement has been complied with is a question which is particularly within the province of the jury." *Eastern Air Lines, Inc. v. McDonnell-Douglas Corp.*, 532 F.2d 957, 973 (5th Cir. 1976).[18]

■ Finally, Carter complains the district court erred in refusing to submit the issue of punitive damages to the jury. The district court instructed the jury "that as a matter of law the plaintiff [Carter] is not entitled to recover any punitive or exemplary damages against the defendant." In Mississippi, "Punitive damages are not recoverable for breach of contract unless such breach is attended by intentional wrong, insult, abuse, or such gross negligence that amounts to an independent tort." *Gulf Guaranty Life Insurance Co. v. Kelley*, 389 So.2d 920, 922 (Miss.1980). The record does not reveal such action by Deere.

■ In addition, fiduciary duties are creatures of equity, *DeTenorio v. McGowan*, 510 F.2d at 103 (Godbold, J. dissenting); *Parker*, 153 So.2d at 276, and, in Mississippi, punitive damages are not recoverable in a court of equity. *Subscribers Casualty Reciprocal Exchange v. Totaro*, 370 So.2d 1342 (Miss.1979); *Avant v. Whitten*, 253 So.2d 394, 396 (Miss.1971). Accordingly, the district court's instruction regarding punitive damages was not error.

### IV. Conclusion

The judgment of the district court is reversed insofar as it relates to the question of whether a fiduciary relationship existed between Carter and Deere. The district court's judgment is also reversed insofar as it relates to whether Deere breached a fiduciary relationship, if any. The case is re-

---

18. On remand, particular notice should be given to this Court's statements in *Eastern Air Lines* indicating that compliance with the notice requirements may be compatible with the continuation of a contractual "marriage" between the parties. *Eastern Air Lines*, 532 F.2d at 979 n.62.

manded for a new trial in order to untangle these two issues. Additionally, the district court's judgment is reversed insofar as it relates to the de facto trustee cause of action, and is remanded for a new trial to determine whether a constructive trust existed, and whether Deere dealt with the res in the manner prescribed by this opinion.

The judgment of the district court is affirmed insofar as it grants a directed verdict against Carter on the claim that Deere tortiously interfered with Carter's contractual rights. The judgment of the district court is reversed insofar as it authorized the jury instruction which precluded an independent fact determination on whether Carter had properly notified Deere of alleged defects in the machinery and, thereby, preserved its claim that Deere breached implied warranties of merchantability. Finally, the judgment of the district court is affirmed insofar as it refused to submit the issue of punitive damages to the jury.

AFFIRMED IN PART; REVERSED IN PART AND REMANDED.