# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-CA-00290-SCT

*MARILYN NEWSOME, INDIVIDUALLY AND AS
CONSERVATOR/CONSERVATRIX OF VICTORIA
D. NEWSOME*

*v.*

*PEOPLES BANCSHARES, INC. d/b/a PEOPLES
BANK AND KEELY R. McNULTY*


| | |
|---|---|
| DATE OF JUDGMENT: | 02/19/2020 |
| TRIAL JUDGE: | HON. JAMES D. BELL |
| TRIAL COURT ATTORNEYS: | TIMOTHY JAMES ANZENBERGER |
| | MARC E. BRAND |
| | WILLIAM C. BRABEC |
| | ALEXANDER FREDERICK GUIDRY |
| | W. TERRELL STUBBS |
| | WILLIAM KANNAN STUBBS |
| COURT FROM WHICH APPEALED: | SIMPSON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | W. TERRELL STUBBS |
| | WADE THOMAS UNDERWOOD |
| ATTORNEYS FOR APPELLEES: | WILLIAM C. BRABEC |
| | ALEXANDER FREDERICK GUIDRY |
| | TIMOTHY JAMES ANZENBERGER |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 11/04/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, C.J., COLEMAN AND CHAMBERLIN, JJ.**

**COLEMAN, JUSTICE, FOR THE COURT**:

¶1.     The present appeal stems from the dismissal with prejudice of Marilyn Newsome's

breach of contract claim against Peoples Bancshares, Inc., d/b/a Peoples Bank. The trial court

found that the Bank reasonably relied on Keely McNulty's apparent authority as Marilyn's

agent when issuing court-ordered cashier's checks from Victoria Newsome's conservatorship account without Marilyn's approval or signature as the account holder. Marilyn appeals.

## Facts

¶2. In 2010, attorney Charles Merkel hired local attorney Keely McNulty to open a conservatorship in the Chancery Court of Simpson County to settle Victoria Newsome's medical malpractice claim. McNulty filed a petition requesting that Victoria's mother, Marilyn Newsome, be appointed conservatrix. Marilyn was issued letters of conservatorship on July 21, 2010.

¶3. At the finalization of Victoria's settlement, the chancellor granted Marilyn's petition to compromise the medical malpractice claim and disburse the settlement proceeds. After a hearing at which Marilyn was present, the chancery court ordered that a portion of Victoria's settlement proceeds be deposited in a separate account for all costs related to constructing a special needs home for Victoria. The chancery court placed McNulty in charge of overseeing the construction.

¶4. When Marilyn informed McNulty that she did not have any preference for a particular bank, McNulty contacted Chris Dunn, a relation of hers by marriage and an employee of the Bank's, to inquire if the Bank handled conservatorship accounts. Because the Bank did, McNulty informed the Bank that her client would be in to create an account that would be court-administered so that disbursements could only be made pursuant to court orders. She advised the Bank that she, as the attorney for the conservatorship, would present the court

2

orders to the Bank for disbursements by cashier's checks made out to the client in the amount specified in the order.

¶5. The court orders did not describe how the Bank was to make disbursements. The Bank ordinarily did not issue checkbooks for court administered accounts, and Bank customers did not sign cashier's checks. A Bank officer signed the cashier's check to confirm that the disbursement was in accordance with a court order.

¶6. Marilyn went to the Bank to set up the conservatorship account and signed a deposit agreement and new account form, designating herself as the sole authorized signor for the account. The chancery court ordered the issuance of 141 cashier's checks for costs related to the house construction. Marilyn never signed any of the petitions for court orders to release funds from the account. For each disbursement, McNulty drafted and filed the order, which she delivered to the Bank, and the Bank issued the cashier's check pursuant to the order, without Marilyn's signature.

¶7. Dunn testified that whenever Marilyn requested disbursements from the Bank for personal, unauthorized reasons, he would remind her that he could only issue cashier's checks in accordance with a court order and that she should consult her attorney, McNulty, about the process.

¶8. The Bank issued the first two court-ordered cashier's checks directly to Marilyn as reimbursement for an inspection and a motel stay resulting from mobile home issues. Marilyn endorsed both of the checks and cashed them without comment or question to the Bank. Additionally, Marilyn was present at the closing for the real property on which Victoria's

house was constructed, paid for with a cashier's check issued from the conservatorship account. Marilyn lived next to the construction site in a mobile home that she picked out, that was titled in her name, and that was purchased with a cashier's check from the conservatorship account.

¶9. The Bank mailed monthly statements for "Miscellaneous Debit" from the conservatorship account to the address Marilyn provided when she set up the account. Even though Marilyn did not reside at the address due to storm damage and never returned to that address, Dunn testified that the postal service never returned any of the statements to the Bank. The conservatorship account is still with the Bank, and Marilyn still keeps her personal checking account at the Bank.

¶10. Conflicting evidence exists as to whether McNulty was the attorney for the conservatorship. Although McNulty testified that she represented Marilyn as conservatrix, then-Chancellor Joe Dale Walker instructed McNulty to prepare an order appointing her as Victoria's guardian ad litem in January 2012. The order, entered nunc pro tunc, was effective January 11, 2011, predating the opening of the conservatorship account. However, no evidence exists that the Bank was aware of McNulty's change in position. The Bank believed that McNulty was the attorney for the conservatorship, and the court ordered the Bank to issue multiple cashier's checks to McNulty for attorney's fees.

¶11. It eventually came to light that then-Chancellor Walker, who was overseeing Victoria's conservatorship, had informed C.T. Construction, owned by his nephew Chad Teater, the exact amount to bid to become the contractor for the construction of Victoria's

special needs home. On February 9, 2015, Marilyn filed her complaint against Chancellor David Shoemake, Joe Dale Walker, Keely McNulty, Chad Teater, Chris Dunn, and the Bank in the Chancery Court of Simpson County, which she amended on February 11, 2016.

¶12. Marilyn settled with McNulty, rendering the Bank's third party claims for indemnity against McNulty moot. In criminal proceedings, Walker and Teater were ordered to pay Victoria restitution.

¶13. At trial, the chancellor granted summary judgment in favor of Dunn and the Bank. On appeal, the Mississippi Supreme Court affirmed in part the summary judgment in Dunn's favor, finding that Dunn could not be held individually or vicariously liable. *Newsome v. Peoples Bancshares*, 269 So. 3d 19, 35 (Miss. 2018). However, the Court reversed and remanded in part, ruling that a genuine issue of material fact existed as to whether McNulty possessed apparent authority to authorize disbursements from the conservatorship account *Id.* at 32.

¶14. On remand, the chancery court found that the Bank reasonably relied on McNulty's apparent authority to its detriment, and it dismissed Marilyn's claim against the Bank. Marilyn has now appealed from the trial court's final judgment.

## Standard of Review

¶15. "Th[e] Court . . . always review[s] a chancellor's findings of fact, but . . . will not disturb the factual findings of a chancellor when supported by substantial evidence unless [it] can say with reasonable certainty that the chancellor abused his discretion, was manifestly

5

wrong, clearly erroneous or applied an erroneous legal standard." ***Cummings v. Benderman***, 681 So. 2d 97, 100 (Miss. 1996) (citing ***Smith v. Dorsey***, 599 So. 2d 529, 533 (Miss. 1992)).

¶16.     "Whether the evidence sufficiently meets the three-prong test of apparent authority is an issue for the fact-finder." ***Andrew Jackson Life Ins. Co. v. Williams***, 566 So. 2d 1172, 1181 (Miss. 1990) (citing ***Baxter Porter & Sons Well Servicing Co., Inc. v. Venture Oil Corp.***, 488 So. 2d 793 (Miss. 1986)). An apparent authority determination is reversible only when "clearly contrary to the overwhelming weight of credible evidence when viewed in the light most favorable to the verdict." ***Id.***

## Discussion

¶17.     Under Mississippi law, "[a]pparent authority exists when a reasonably prudent person, having knowledge of the nature and the usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have." ***Newsome***, 269 So. 3d at 29 (internal quotation marks omitted) (quoting ***Eaton v. Porter***, 645 So. 2d 1323, 1325 (Miss. 1994)). The elements for determining the existence of apparent authority include: "(1) acts or conduct by the principal indicating the agent's authority; (2) reasonable reliance by a third party upon those acts or conduct; and (3) detrimental change in position by the third party as a result of such reliance." ***Id.*** at 29-30 (quoting ***Barnes, Broom, Dallas & McLeod, PLLC v. Estate of Cappaert***, 991 So. 2d 1209, 1212 (Miss. 1994)). "[T]he principal is bound *if the conduct of the principal* is such that persons of reasonable prudence, ordinarily familiar with business practices, dealing with the agent might rightfully believe the agent to have the power he

6

assumes to have." ***Id.*** at 30 (alteration in original) (internal quotation marks omitted) (quoting ***Steen v. Andrews***, 78 So. 2d 881, 883 (Miss. 1955)). Moreover, "[a] principal, having clothed his agent with the semblance of authority, will not be permitted, after others have been led to act in reliance of the appearances thus produced, to deny, to the prejudice of such others, what he has theretofore tacitly affirmed as to the agent's powers." ***Id.*** at 31 (internal quotation marks omitted) (quoting ***Steen***, 78 So. 2d at 883).

¶18. The chancellor's findings that McNulty possessed apparent authority to act on Marilyn's behalf are factually supported.

## I. Acts Indicative of Authority

¶19. The chancellor found that Marilyn expressly indicated McNulty's authority to act on her behalf when she opened the conservatorship account with the Bank at McNulty's instruction and after McNulty had called saying that her client would be in to create an account.

¶20. In ***Newsome***, the Court found that Dunn's testimony was sufficient to establish that Marilyn's conduct indicated McNulty's apparent authority. 269 So. 3d at 30. In its decision, he Court relied on ***Estate of Cappaert***, in which the principal ratified the actions of the agent by failing to object to the agent's representation until he was terminated. 991 So. 2d at 1212. Likewise, Marilyn's inaction after endorsing and cashing her cashier's checks without complaint were indicative of McNulty's apparent authority to act as Marilyn's agent in delivering court orders and in collecting court-ordered disbursements from the Bank.

¶21. Additionally, when Marilyn came to the bank to request personal withdrawals unauthorized by court order, Dunn testified that he would explain the authorization process to Marilyn and advise her to consult McNulty. The chancellor found that her failure to correct Dunn and deny McNulty as her lawyer or assert that she was the sole authorized signor for the account were suggestive of McNulty's apparent authority to deliver court orders and receive the cashier's checks.

¶22. Even if Marilyn was confused as to the process of withdrawing funds from the conservatorship account, the Bank still relied on her actions and inactions in assuming McNulty's apparent authority to act on Marilyn's behalf. The focus is not on Marilyn's knowledge but on the Bank's knowledge. *Newsome*, 269 So. 3d at 30. We hold that, here, as a matter of law, sufficient acts indicative of apparent authority exist.

## II. Reasonable Reliance

¶23. The chancellor found that the Bank was reasonable in assuming that McNulty was Marilyn's agent and that it was acting in good faith when it issued cashier's checks according to court orders. McNulty called the Bank to see if it handled conservatorship accounts and told them that her client would be in to set one up. Additionally, McNulty personally delivered all court orders to the Bank. The Bank did not deviate from its standard practice of handling court-administered conservatorship accounts. It sent monthly statements to the address Marilyn provided, and the postal service did not return any statements. Finally, Marilyn failed to object to the issuance of cashier's checks from the account to herself, and she instead endorsed and cashed them without complaint.

¶24. Marilyn argues that the Bank did not act reasonably in following its in-house procedures because the deposit agreement identified Marilyn as the only authorized signor. However, the chancellor found that the Bank was reasonable in adhering to its normal procedure of operating a court-administered conservatorship account, which did not require a client signature and was guided by the authority of the court orders and McNulty's apparent authority.

¶25. Marilyn further contends that the chancellor failed to take into account Dunn's relationship with McNulty. However, as fact-finder, the chancellor "is the sole judge of the credibility of witnesses," ***Murphy v. Murphy***, 631 So. 2d 812, 815 (Miss. 1994) (citing ***West v. Brewer***, 579 So. 2d 1261, 1263-64 (Miss. 1991)), and Dunn testified that his relationship to McNulty had no effect on his dealings with the conservatorship account.

### III. Detrimental Reliance

¶26. The chancellor found that the Bank relied on McNulty's apparent authority to its detriment because Marilyn now seeks reimbursement of the cashier's checks. Marilyn does not contest the finding.

¶27. However, Marilyn points to the principle of equity that "as between innocent persons, the one who is in the best position to protect himself should suffer any loss resulting from the default of a third party[.]" ***Western Cas. & Sur. Co. v. Honeywell, Inc.***, 380 So. 2d 1385, 1389 (Miss. 1980). She argues that the Bank was in the best position to prevent loss, so the Bank should absorb the damage. But Marilyn was more likely in the best position to prevent loss by simply telling the Bank that she did not authorize any of the disbursements from the

9

conservatorship account. Additionally, Marilyn already has settled with McNulty and has been paid restitution by Walker and Teater.

¶28. Marilyn also contends that the Bank should reimburse her the value of the cashier's checks because she allegedly suffered more than the Bank, but most of the court-ordered disbursements benefitted Marilyn, covering her living expenses and the construction of her daughter's special needs home.

¶29. Marilyn further claims that the Bank owed a fiduciary duty to Marilyn, which it violated. However, Mississippi law provides that banks do not owe a fiduciary duty to their customers unless "the activities of both parties goes beyond their operating on their own behalf and the activity is for the benefit of both." ***Burgess v. Bankplus***, 830 So. 2d 1223, 1227 (Miss. 2002) (internal quotation mark omitted) (quoting ***Carter Equip. Co. v. John Deere Indus. Equip. Co.***, 681 F.2d 386, 391 (5th Cir. 1982)). An arms length business transaction involving a normal debtor-creditor relationship does not establish a fiduciary relationship, ***Hopewell Enters., Inc. v. Trustmark Nat'l Bank***, 680 So. 2d 812, 816 (Miss. 1996), and Marilyn's relationship with the Bank never extended past the standard debtor-creditor relationship.

¶30. Because the chancellor was not with reasonable certainty manifestly wrong or clearly erroneous and because substantial evidence supports the chancellor's findings that McNulty possessed apparent authority, we affirm the trial court's dismissal of Marilyn's claims against the Bank.

¶31. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., MAXWELL, CHAMBERLIN AND ISHEE, JJ., CONCUR. BEAM AND GRIFFIS, JJ., NOT PARTICIPATING.**